### BATCHELLER v. THOMSON (two cases).

### THOMSON v. BATCHELLER.

(Circuit Court of Appeals, Second Circuit. April 4, 1899.)

Nos. 92-94.

1. TRADE-MARK—USE BY FIRM—ASSETS.

A manufacturer of corsets in England adopted a trade-mark before its use in this country; and its application to the goods before their importation, and its distinct ownership, were known and acted upon by a firm in New York, of which the manufacturer was a member. The goods so manufactured and stamped in England were sold to the New York firm, and the trade-mark was subsequently permitted by the owner to be used by the firm on corsets manufactured by it in the United States. *Held*, that this licensed use in the business of the firm of the trade-mark owned by one partner did not place the trade-mark in the firm, as a part of its assets, nor make it partnership property.

2. SAME—LICENSE TO USE.

On the dissolution of the partnership, and the transfer by the owner of the trade-mark of his interest in the factory property, such owner could continue in the purchaser the right to use the trade-mark which he had previously permitted the firm to use in their factory.

3. SAME—RELINQUISHMENT OF LICENSE.

Where the owner of a trade-mark had been continuously, and still was, both the owner of the trade-mark, and a manufacturer of the goods on which it was affixed, the relinquishment of a license which he had granted to another to use the trade-mark was not void on the ground that a trade-mark, distinct from the articles manufactured, was not the subject of sale, as such transaction was simply a relinquishment to the owner of the license to use his property.

4. SAME—CONTRACT AS TO LICENSE.

An agreement between the owner of a trade-mark and another, a member of a firm to whom he had granted a license to use it, that, when such member retired from the firm, all the rights and privileges granted to him should revert to the owner of the trade-mark, was an agreement that on such retirement the use of the trade-mark should cease.

**5. Same.—Exclusive Use.**

Where a trade-mark antedated a patent relating to the article to which the trade-mark applied by more than two years, and the name, and not the patent, gave value to the article, the expiration of the patent did not terminate the exclusive right to use the trade-mark.

Appeals from the Circuit Court of the United States for the Southern District of New York.

These three appeals relate to two bills in equity, known in the case as suits 1 and 2, brought before the circuit court for the Southern district of New York by George C. Batcheller, of the city of New York, against William S. Thomson, of London, England, with respect to the title and use of a trade-mark. In suit No. 2, Thomson filed a cross bill, in which he prayed for an injunction against the use by Batcheller of the same trade-mark. The circuit court decreed for complainant in the two bills, and dismissed the cross bill. 86 Fed. 630.

Hamilton Wallis, for appellant.

S. D. Cozzens, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. On January 1, 1865, the firm of W. S. Thomson, Langdon & Co. was established in the city of New York; the partners being William S. Thomson, Charles H. Langdon, and George C. Batcheller. Thomson and Langdon had been partners for a number of years. Thomson's brother-in-law, William A. Nettleton, was taken into the firm in 1866, and retired May 31, 1869. In June, 1869, the firm became Thomson, Langdon & Co., and continued under the same name until December 31, 1878, Thomson, Langdon, and Batcheller being partners, when Thomson sold his interest to Langdon, and the partnership was dissolved. Before 1865, W. S. Thomson went abroad, and thereafter continued to live in Paris or London, and with his brother, under the name of Thomson Frères, commenced to manufacture corsets in Paris in 1865, which were called "Corsets Gants." The firm of W. S. & C. H. Thomson, consisting of four persons, commenced in England, in the latter part of 1866, the manufacture of corsets called "Thomson's Glove-Fitting Corsets." The French and the English firms were entirely distinct from the New York firm. The interests of the three other members of the English firm were subsequently purchased by W. S. Thomson. To these English corsets, offered for sale and sold in England during the early part of 1867, the trade-mark above mentioned was affixed by Thomson, and the articles so marked were vendible articles in the market. In May, 1867, Langdon went to Paris, and also to England, and during his absence saw these corsets, and wrote to his New York partners in reference to manufacturing them in this country, and thought that the business would be profitable, as "we should make the name of the glove-fitting corset a specialty." Samples for examination were sent from the English factory to the New York firm, and in reply an order for 200 dozen was sent on June 18th; and thereafter a most extensive business sprang up, in the purchase from Thomson, and in the sale in the United States, of these imported corsets, which were manufactured in England, and there stamped by Thomson with his trade-mark. The purchases from Thomson continued until the erection by the New York

firm, with his consent, of a factory in Bridgeport, Conn., in 1877, where the corsets which they sold in the United States were subsequently manufactured by the firm, and were stamped with the trademark.

The contested question of fact in the case was in regard to the priority of the use of the trade-mark; the complainant endeavoring to show that the name was invented by the New York firm, and was applied by it to the samples which came from London and were sold in New York before the actual use of the name upon goods sold in London. In view of the testimony derived from the written documents signed or known at the time of their date by all the parties, their conduct, and the previous declarations of Batcheller under oath, it is manifest that the origin of the trade-mark in London, before its use in this country, its continued application to the goods before their importation, and its individual ownership by Thomson, distinct from his interest in the New York firm, were known and acted upon by that firm constantly during the continuance of the partnership of Thomson, Langdon & Co. The oral testimony of the parties in regard to the order of events in 1866 and 1867 might leave the mind in uncertainty as to that order, but the written business papers in the execution or formation of which the three partners were brought together, and their conduct at the time of the dissolution, leave no doubt that Thomson's ownership of the trade-mark was, during the partnership, conceded.

Before Thomson's retirement from the firm, in December, 1878, three written agreements were executed, which, though not bearing the same date, were parts of the same transaction of sale to Langdon, and dissolution of partnership. By an agreement of October 31, 1878, between Thomson and Langdon, the former sold to the latter all his interest in the Lyman patent, which will be hereafter mentioned, and also assigned to Langdon "all the interest and claims of said Thomson in and to any and all trade-marks, of any description whatever, heretofore used by said Thomson, Langdon & Co. in the United States, with the full privilege and liberty to use the same during his lifetime in such manner as said Langdon may deem best." He also had the right to use the business signature of Thomson, Langdon & Co. as long as he was personally engaged in the business then carried on by that firm. The second agreement between the same parties refers to a sale to Langdon by Thomson of all his interest in the assets and property of the firm. In a third agreement between the three partners, Langdon & Batcheller agree that so long as the new firm of which they two shall be partners shall continue to use the designation of Thomson, Langdon & Co., or stamp the name of Thomson upon their goods, the new firm "will entirely abstain from selling any goods manufactured by them, which the London house of W. S. Thomson & Co. now make," to or for the markets of Canada or Great Britain. On October 29, 1883, Thomson and Langdon had an interview in New York, in which Thomson sharply charged the existing firm with having sold corsets in Canada. As a result of that interview, Langdon wrote him a letter of that date, which contained sundry agreements, of which the fourth was as follows:

"4th. That in case I shall have any interest in any new co-partnership which may be formed after the expiration of the present co-partnership, on the first January, 1885, or at any earlier date, for the transaction of business in corsets, busks, crinolines, or goods of that character, then Mr. William A. Nettleton shall be a partner in said business, and shall have for his services an interest therein of 25%, without the necessity of furnishing any capital to the same; and, in case I retire from the business, I hereby agree that the contract and agreement made between us on the 31st October, 1878, shall in that case become null and void, and that all the rights and privileges ceded by you to me shall then revert to you."

At this time Nettleton was a partner, and so continued after January, 1885, on the terms named in this letter. Langdon and Batcheller continued as partners from January 1, 1879, until December 31, 1881, when a partnership consisting of Langdon, Batcheller, Nettleton, and one Colton was formed, which continued to December 31, 1884. The third change took place on January 1, 1885, when Colton retired. Nettleton retired December 31, 1887. The firm continued until December 31, 1888. All these firms bore the name of Thomson, Langdon & Co. Thereafter the firms were called Langdon, Batcheller & Co., but Langdon retired January 1, 1893, and assigned his interest in the trade-mark to Batcheller, who continued the manufacture of corsets and the use of the trade-mark. Langdon is 79 years old. Thomson has continued the manufacture of corsets in England under his trade-mark to the present time, and they have been extensively sold in England, upon the continent of Europe, and in Canada. On October 22, 1889, he registered his trade-mark in the United States patent office; and in 1871 Thomson, Langdon & Co. (Langdon purporting to act as attorney for Thomson) registered in the patent office the trade-mark, "Thomson's Patent Glove-Fitting Corset." When Thomson commenced in Paris and in England the manufacture of corsets, they were made in accordance with an alleged invention of Edward Drucker. Letters patent of the United States for this corset were issued in the name of Drucker on May 7, 1867; but the corsets made accordingly were unsatisfactory, the alleged invention was concededly of no value, ceased to be used, and an improvement was made in England by an employé of Thomson, which was patented in the United States on November 30, 1869, to Henry A. Lyman, assignor to Thomson, Langdon & Co. This patent expired November 30, 1886. How closely the corsets of complainant or defendant followed this improvement did not appear, and, indeed, the distinctive value which the improvement imparted to the product did not appear.

The relief prayed for in suit No. 1 was that the registration of the trade-mark which was obtained by Thomson on October 22, 1889, should be declared void, and should be annulled. In suit No. 2, the complainant averred that he was entitled to the entire interest in the trade-mark in the United States, and prayed that Langdon's agreement of October 29, 1883, should be declared not to have created any title thereto in Thomson. The cross bill prayed for an injunction against the use of the trade-mark by Batcheller.

The circuit court found that the use of the trade-mark began in New York and in London at about the same time; that it identified the corsets of the New York firm, and belonged to the New York business;

that Thomson sold to Langdon his interest in the trade-mark, as used in the New York business; and that, as he never resumed his interest in the business, he could resume no right in the trade-mark. From the finding of facts which has been given in regard to the origin and use of the trade-mark from 1866 to 1877, it appears it was originated by Thomson, was used by him upon his entire product, was stamped in England upon all the goods which he sold to Thomson, Langdon & Co., and was subsequently permitted by him to be used upon the product of their Bridgeport factory. This licensed use in the business of a firm of the trade-mark owned by one partner does not place the trade-mark in the firm, as a part of its assets. Thomson's permission or allowance to the firm to use his trade-mark did not make it partnership property. Kidd v. Johnson, 100 U. S. 617. Upon the dissolution of the partnership, and the transfer by Thomson of his interest in the factory property, he could rightfully continue in the purchaser the right to use the trade-mark which he had previously permitted the firm to use in their factory. The ownership and right to a general use remained in Thomson, the limited right to use for a limited period being continued in Langdon individually.

It is said that the relinquishment of this license to Thomson by Langdon was void, because a trade-mark, as distinct property, separate from the article created by the original manufacturer, is not the subject of sale. Kidd v. Johnson, supra. But Thomson had been continuously, and still was, both the owner of the trade-mark and the extensive manufacturer of the goods to which it was affixed, and Langdon simply relinquished to the owner a license to use his property.

The construction of Langdon's agreement of October 29, 1883, is also in controversy; the question being whether his right to use the trade-mark ceased whenever he retired from business, or whether it continued during his lifetime, if he did not retire in 1885. The record furnishes very little light in regard to the circumstances which induced the execution of this agreement. It simply appears that, whereas Thomson and Langdon had been very intimate friends, Thomson now distrusted the new firm, and feared that his brother-in-law would be displaced. It is suggested that the promise of Langdon related exclusively to the next partnership, and was connected with Nettleton's continuance, and meant, "If I then retire, the use of the trade-mark will cease; but, if I do not then retire, it continues as before" The agreement, however, related to the retention of Nettleton in any subsequent partnership, and looked to a longer future than the partnership of 1885, and said, also, "When I retire, the use of the trade-mark shall cease." The natural rendering of the agreement is that, whereas Thomson distrusted the fidelity of the new firm to their agreement in regard to sales in Canada (in other words, distrusted Batcheller), Langdon said, "Your brother-in-law shall continue in any of the partnerships, and, when I retire, you shall have your trade-mark." It is noticeable that the limited interpretation was nowhere sought or claimed by the complainant.

The complainant seeks to make use of the principle stated in Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, that, if the owner of a patent had given to its product a name which constituted its

generic description, the right to make the patented article and to use the generic name passed to the public upon the expiration of the patent, and that, therefore, the exclusive right to use the trade-mark of the corset ceased with the life of the Lyman patent. In this case the name antedated this patent by more than $2\frac{1}{2}$ years, and the name, and not the patent, so far as can be seen, gave value to the article. The Drucker patent was for an alleged improvement in the old class of corsets, in which seams run transversely, and was of no value. The Lyman patent was for an alleged improvement upon Drucker in the same class of corsets. The Thomson corset was extensively advertised, and was a favorite, but whether its value was connected with the Lyman patent is unknown.

The decrees of the circuit court are reversed, with costs, upon the appeal from the decree upon the cross bill; and the cases are remanded to that court, with instructions to dismiss the two bills of the complainant, without costs, and to enter a decree, with costs, upon the cross bill, that Batcheller has no adequate title to the trade-mark, and for an injunction against its use, upon such terms, as to time of issuing the order, as the circuit court shall deem reasonable.