WARREN FEATHERBONE CO. v. AMERICAN FEATHERBONE
CO. et al.

(Circuit Court of Appeals, Seventh Circuit.   April 11, 1905.)

No. 1,089.

1. TRADE-MARKS—NAME GIVEN TO PATENTED ARTICLE—"FEATHERBONE."

The patentee of a new product used as a substitute for whalebone, and made from the quills of feathers, gave the same in the specification the generic name of "Featherbone," by which name it was referred to by him in subsequent patents and became generally known; the word being so defined subsequently in dictionaries, both American and foreign, and used in foreign tariff laws, etc. *Held*, that on the expiration of the original patent the public had the right, not only to make the article, but to sell it by the name "Featherbone," and that such name could not be monopolized by the patentee as a trade-mark for his own manufacture.

2. SAME—UNFAIR COMPETITION.

Evidence *held* not to establish unfair competition by a defendant which engaged in the manufacture and sale of featherbone after the patent thereon expired, as against the owner of the patent, which had previously been the sole manufacturer, merely because defendant used the name "Featherbone," to which it had the right, and the articles themselves from their character were not distinguishable; there having been no attempt to imitate the dress or labels of complainant.

[Ed. Note.—Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

Appeal from the Circuit Court of the United States for the Eastern District of Wisconsin.

This is a bill in equity filed by the appellant July 9, 1903, for alleged violation of its trade-mark or trade-name "Featherbone," and also to enjoin unfair competition in trade. At the circuit the bill was dismissed for want of equity.

The facts are substantially these: Edward K. Warren, the appellant's predecessor, in the year 1883 invented an improvement in "corset-stiffeners," having for its object the utilization as a rib or stiffener for corsets and other articles of dress or fabrics, of the stalks, stems, or quill portions of feathers, and using them as a substitute for whalebone in corsets and other articles of dress, and in surgical appliances. For this invention letters patent of the United States were issued to him October 16, 1883, for a "corset-stiffener" formed of quills or quill splints stripped of the feathers and bound together, as shown and described. In the specification, he termed the improved bone or rib "featherbone."

On February 3, 1885, another patent, No. 311,621, was issued to him for "stiffening-strip and mode of producing the same," being an improvement upon the invention secured by the previous letters patent. In the specification to this patent he states: "By this method of proceeding I produce a firm flat strip of this material, which I have termed 'featherbone,' " etc. The first claim of this patent is for "an improved article of manufacture, the flat strip composed of two or more strands of featherbone cord," etc.

On October 6, 1885, another patent, No. 327,626, was issued to him for a

141 F.—33

"method of attaching stiffenings to dress-waists." In the specification the following occurs: "The stiffening material preferred is made of what I call 'featherbone.'"

On September 25, 1888, another patent, No. 389,993, was issued to him for a "garment-stay." The following occurs in the specification: "Furthermore, the stiffening-strip, even when made of featherbone, may be made up," etc.

On May 12, 1896, there was issued to him and to Jonas H. Holden, patent No. 559,827, for "corset-stiffener and method of making same." In the specification to this patent occurs the following: "Our invention relates to improvements in 'featherbone' and in the method of manufacturing the same and to improved apparatus for the purpose. 'Featherbone' is a fanciful name given to the corset-stiffener, for which Edward K. Warren received letters patent No. 286,749, dated October 16, 1883, and letters patent No. 311,621, dated February 3, 1885, issued to him for a further improvement in the manufacture of said featherbone. * * * Our invention has for its objects improvements in featherbone and in the method of manufacturing the same," etc.

On August 17, 1897, another patent was issued to Warren, No. 588,301, for "woven stiffening fabric." In the specification occurs this: "These are preferably made of the fiber of quills of feathers, which are wound similar to the material composing my improved featherbone described in patent No. 286,749, dated October 16, 1883," etc.

On November 22, 1887, there was issued to one Edward B. Cady, letters patent No. 373,720, for "stiffening for corsets" in the specifications to which the following occurs: "In the drawings, A represents a small bundle of the filaments or fibers of sisal, reed, rattan, whalebone, or featherbone, or other equivalent material," and the term "featherbone" in the specifications and in the claims is used seven other times as the name of a material or product.

On August 5, 1884, Warren registered in the Patent Office the name "Featherbone" as a trade-mark, and in that year assigned the same and the business in which he was engaged and with which it was associated, to the appellant, who since has conducted the business referred to in the several patents. The appellant devised various uses for the material "Featherbone," to which it applied peculiar and particular designations, as follows: an "Eyelet Bone" for the foundation of eyelets at the back of dresses; a "Hook and Eye Bone" for the foundation of hooks and eyes in the front of dresses; a single cord "Skirt Bone" for a stiffening for wearing apparel; a double cord "Skirt Bone," a "Three Cord Tape," a "Five Cord Tape," a "Ten Cord Tape," for a variety of uses in stiffening various parts of garments; a "Piping Bone" for stiffening bonnets and for producing a shirring effect in dresses; a "Collar Bone" for stiffening tapes or cords and fabrics for wearing apparel. The words "Skirt Bone" and "Collar Bone" were duly registered as trade-marks. Standard lengths for these various descriptions of goods were adopted by the appellant, and the goods were contained in flat square pasteboard boxes appropriately labeled. The appellant also issued sample books displaying the articles so appropriately labeled. By reason of extensive advertising, and of the excellence of the article, a large trade has been established by the appellant, the sales increasing yearly, from 41,712 yards in the year 1888, to 9,942,104 yards in the year 1902. The article appears to have superseded to a great extent the use of whalebone as a stiffener for wearing apparel.

On April 16, 1901, the appellant filed and registered in the Patent Office, a statement and declaration of trade-mark, No. 36,248, in which it declared that it had adopted for its use a trade-mark for stiffening material, consisting of the representation of a turkey, and asserting that that trade-mark had been continuously used in its business since January 1, 1891; that the class of merchandise to which the trade-mark is appropriated is stiffening material, and the particular description of goods comprised in the class is stiffening tapes, cords, and fabrics for wearing apparel, and is usually displayed upon the box or package containing the goods, but may be affixed to the goods themselves in a suitable manner, and is also used in advertising matter, stationery, etc. The packages or boxes in which the appellant's goods are marketed have conspicuously upon the top, pictures of a feather with the words "Warren's Featherbone" and "Trade-mark," or the picture of a turkey, or of a barnyard containing turkeys, the goods themselves being unmarked.

The appellee, the American Featherbone Company, began in 1902, the manufacture of the article covered by the expired patent issued to Warren, applying thereto the name "Featherbone," but the goods sold by it bore no mark or device except the words, "Made by American Featherbone Company," or "Manufactured by American Featherbone Company," which inscription is stamped or printed upon the goods, or such of them as are capable of having such stamp. The packages containing them are of plain paper, having no pictures or advertisement, and having printed conspicuously upon them the words, "Featherbone —Manufactured by American Featherbone Company." The black goods manufactured by both parties are incapable of being legibly stamped or printed, by reason of their color, and cannot be distinguished from each other when out of the box. The boxes are conspicuously unlike in their markings. It is usual with manufacturers of dress-stays of various kinds to cover their strips with textile fabrics such as silk, satin, etc., in different colors, to ornament the edges with notches, pinking, etc., to ornament the covered strips with longitudinal lines of fancy stitching, and provide the covers with selvages with which to sew them to the garment. The appellant has placed upon the market many different grades of strips with different covers. The appellee company does the like, as do other manufacturers. These ornamental devices are not peculiar to the appellant's goods, but are matters of common usuage. The appellee makes several grades of stiffening strips for certain special uses, the boxes containing them being marked respectively "Featherbone for Skirts, Manufactured by American Featherbone Company"; "Silk Covered Featherbone for Collars. Manufactured by American Featherbone Company;" "Featherbone Cord for Piping. Manufactured by American Featherbone Company."

The Landauer Company were purchasers of goods of the American Featherbone Company.

Chas. K. Offield, for appellant.

John W. Hill and Jacob Rothschild, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts). That Warren was the inventor of a new and useful article may not be denied. The merit of his invention was recognized by the government and monopoly thereof granted to him by the patent of 1883. Warren then coined a new word, "Featherbone," which in the specification to that patent was first employed as descriptive of, and as the name of the article produced by his invention. In all subsequent patents, the name is so used, and it became generally known as the designation of the article itself. Thus in the Century Dictionary, edition of May, 1889, we find the word and its meaning:

"Featherbone. A substitute for whalebone, made from the quills of domestic fowls. The quills are split into strips, which are twisted, and the resulting cords are wrapped together and pressed."

In the Standard Dictionary, edition of 1894, we find:

"Featherbone. A substitute for whalebone prepared from the quills of feathers."

In Murray's English Dictionary, edition of 1901, we find:

"Featherbone. 1887, Chicago Advance, 17 Feb. 112, Featherbone—prepared from the quills of geese and turkeys, is largely taking the place of whalebone in the manufacture of whips."

In the Canadian tariff act of 1900, it is recognized as a known article of commerce, and a duty is imposed upon its importation in these words:

"Featherbone, plain or covered in coils, 20 per cent."

The term has thus become the name of the article produced from the quills of feathers and used as a substitute for whalebone. Indeed, as abundantly appears from the specifications to the various patents, the term was coined by Warren as a generic designation of the product, and not as indicating the origin of the manufacture. It was the name that in the patents he gave to the product of his invention. Under these circumstances the question occurs whether the name of a patented article at the expiration of the patent falls into the public domain with the patented article. We consider this question to be no longer an open one. It has been resolved by the ultimate tribunal (Goodyear Company v. Goodyear Rubber Company, 128 U. S. 598, 9 Sup. Ct. 766, 32 L. Ed. 535; Singer Manufacturing Company v. June Manufacturing Company, 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118; Elgin National Watch Company·v. Illinois Watch Case Company, 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365; Holzapfel's Compositions Company v. Rahtjen's American Composition Company, 183 U. S. 1, 22 Sup. Ct. 6, 46 L. Ed. 49), and its ruling has been followed and applied by this court (Horlick's Food Company v. Elgin Milkine Company, 56 C. C. A. 544, 120 Fed. 264.)

It was sought at the bar to distinguish the Singer Case from the one in hand, upon the ground that in the former case the three patents covering distinct parts of the Singer machine had expired, while here some of the patents for improvements upon the original method of preparing the article have not expired, and it is said that all of these patents must expire before the public can take the name "Featherbone" for use in respect to the article produced. We think this contention cannot be upheld. The fact was as stated in respect to the Singer Case; but as we read that decision it does not proceed and is not based upon that ground. The general principle is declared and stated. The fact that the several patents had expired was an incident not affecting the decision. Indeed the contention could not well be upheld; for there would then be given to every patentee a monopoly limited in point of time only by the ingenuity with which improvements could be devised and patented. Upon the expiration of the patent, the public had the right to make the article named in the patent, and had the right to call it by the name which the patentee had given to the article. The point is well stated in Linoleum Manufacturing Company v. Nairn, L. R. 7 Ch. Div. 834. The action there was to restrain the use of the word "Linoleum" as applied to floor cloth, the name being given to the article by the patentee. It was a fanciful name and had not been previously used. Upon the expiration of the patent the defendants proposed to make and sell linoleum floor cloth, calling it by that name, and the court observed:

"In the first place, the plaintiffs have alleged, and Mr. Walton has sworn, that, having invented a new substance, namely, the solidified or oxidized oil, he gave to it the name of 'Linoleum,' and it does not appear that any other name has ever been given to this substance. It appears that the defendants are now minded to make, as it is admitted they may make, that substance. I want to know what they are to call it. That is a question I have asked, but I have received no answer; and, for this simple reason, that no answer could be given, except that they must invent a new name. I do not take that to be the law. I think that if 'Linoleum' means a substance which may be made by the defend-

ants, the defendants may sell it by the name which that substance bears. But then it is said that although the substance bears this name, the name has always meant the manufacture of the plaintiffs. In a certain sense that is true. Anybody who knew the substance, and knew that the plaintiffs were the only makers of this substance, would, in using the word, know he was speaking of a substance made by the plaintiff. But, nevertheless, the word directly or primarily means solidified oil. It only secondarily means the manufacture of the plaintiffs, and has that meaning only so long as the plaintiffs are the sole manufacturers."

The court concludes:

"That solidified or oxidized oil may be made by the defendants if they are minded to make it; and if they are minded to call it by the only name which it bears, I think they are at liberty so to do."

Upon the expiration of the first patent to Warren the public had the right to manufacture the article described in the patent and to sell it by the name by which in the patent it was designated, to wit, "Featherbone." If the appellees so exercising that right have infringed upon any subsequent and existing patent, they may be called to account for an infringement of that patented right; but they have the right to designate the article which they manufacture as described in the expired patents, and to call it by its legitimate name, "Featherbone"—a name given to the substance by the patentee.

The second question involved concerns the subject of unfair trade. Notwithstanding the appelleees have a right to the use of the word "Featherbone," they have no right to so disguise their goods that they may be mistaken by a purchaser exercising the ordinary care of purchasers, as and for the goods of the appellant. We have given careful scrutiny to the oral evidence bearing upon this question, and to the exhibits, and find no ground of support for the contention that there has been any unfair competition in trade. There is no proof of actual mistake, and we find no imitation of marks or names, tending to a confusion of goods. While the packages of the appellees bear the name of the article "Featherbone," and rightfully so, as we consider, there is nothing upon them to indicate that they contain goods manufactured by the appellant. To the contrary, there is an entire absence of all the distinguishing marks which appeal to the eye, to be found upon the packages of the appellant, and the name of the manufacturer, "American Featherbone Company," is plainly and unmistakably imposed thereon. In the one case, the covers of the boxes containing the product are covered with advertising matter relating to the article; in the other the cases are perfectly plain. We should not hesitate to restrain any attempt by the appellee to palm its goods upon the public as the goods manufactured by the appellant; but we fail to find in this record any evidence warranting the suggestion of such imposition. It may be that the goods themselves may not be distinguishable from the goods manufactured by the appellant. That arises from the character of the article and that it is incapable of distinguishment, except as the name of the manufacturer is stamped upon it; but the marks upon the packages which contain the goods and in which they are sold, bear no resemblance to each other, except in the use of the word "Featherbone."

The decree is affirmed.