AMERICAN FEATHERBONE CO. v. WARREN FEATHERBONE CO.

(Circuit Court of Appeals, Seventh Circuit.   August 1, 1905.)

No. 1,151.

PATENTS—PRIOR PUBLIC USE—FEATHERBONE.

The Warren and Holden patent, No. 559,827, for a process of manufacturing featherbone, and the resulting product, while disclosing invention of a meritorious character, is void for prior public and commercial use of the invention by the patentees for more than two years before the filing of the application.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

For opinion below, see 133 Fed. 304.

The Warren Featherbone Company is the complainant in a suit against the appellant, American Featherbone Company for infringement of letters patent No. 559,827, issued May 12, 1896, to Edward K. Warren and Jonas H. Holden, assignors of the complainant, for an improved process and product in the manufacture of so called "featherbone." This appeal is from a decree which sustains the patent, finds infringement by the appellant, and grants a perpetual injunction.

Application for the patent was filed March 5, 1895. The specifications and explanatory drawings (Figs. 1 and 2), in so far as they are deemed material, are as follows:

"Our invention relates to improvements in 'featherbone' and in the method of manufacturing the same and to improved apparatus for the purpose. 'Featherbone' is a fanciful name given to the corset stiffener, for which Edward K. Warren received letters patent No. 286,749, dated October 16, 1883, and letters patent No. 311,621, dated February 3, 1885, issued to him for a further improvement in the manufacture of said featherbone. In the construction of featherbone as described in these former patents, in the first patent the fiber was wound into cords, and in the second one the cords were wound together side by side to form a broad flat blade, then the flat blade was stitched through, and this, with winding it, gave the same firmness and prevented it from becoming loose or falling apart; but in this construction there would frequently be small projections formed upon the blade or cord, which would remain there constantly, and a mere rolling or laundering was insufficient to make the blade smooth and flat, and the blade as then constructed was more liable to injury, for when a thread became broken, as the featherbone depended entirely upon winding to hold the fibers together, the blade or cord was likely to become frayed in this way.

"Our invention has for its object improvements in featherbone and in the method of manufacturing the same, to construct the same so that the blade shall be smooth and flat and thin and possess continuity in itself, not depending entirely on winding of the quill fiber to make the blade firm, and also to compact the blade so that it will be more strong and elastic where

such qualities are desired to answer its purpose. We desire to state, however, that in some instances it is not desired to make the blade stiff and firm, and we only refer to this as a means of constructing the same when it is desired to so manufacture the blades or cords of featherbone. * * *

"After the blades of featherbone have been wound and stitched, as indicated in the patents to said Warren above mentioned, we proceed to treat the same by first passing the strip of featherbone (which is constructed in a continuous strip as long as it will be convenient to handle) through a suitable sizing composed of glue and other suitable constituents, which can be so various that an attempt at enumeration would be useless. The strip should be thoroughly saturated. A long band of featherbone, C, is dipped down into the box or trough, A, containing sizing and passed into a dry-room, B, which is heated in any suitable and convenient manner to dry the sized featherbone quickly and as dry as it is possible to dry it by such means. The featherbone is then passed through the steam-heated tube or pipe, D'. It is passed through the small pipe, D', which is inserted in the large steam-pipe, D, which is connected by the pipes shown, which permits of a continuous flow of steam around the smaller pipe. This heating pipe in actual use is over 12 feet long, but the length of it is immaterial so long as the strip of featherbone, C, becomes thoroughly heated, and a greater or less length than 12 feet may be used, as speed or other circumstances may require. The strip of featherbone should be so thoroughly heated by this process that the fibers of quill contained therein are thoroughly softened; in fact, almost melted. This is accomplished by heating the same to very nearly the boiling point of water, which is accomplished by the steam-heated tube. As soon as it is heated in the pipe, it is passed out immediately before cooling between the cold rollers, E, E, E, E, which are made male and female to receive the same, and compress and form it into exactly the sized strips desired. One set of rollers can be used or more than one. In practice, several sets are used, and the strip passed through them continuously. The process of heating and rolling can be repeated, if desired, to produce an extra quality of featherbone; but for all ordinary purposes once heating and rolling or calendering is all that is required.

"We desire to state that in practice it is found that the sizing causes the thread to adhere to the fibers of the featherbone, and also fills up the small interstices between the fiber of quills in the strip; and when the featherbone is properly and thoroughly cooled and dried, it affords a composition which unites very firmly with the fibers of the featherbone and connects the thread very tight to it also. When the strip of featherbone is passed through the heating tube, the heat is sufficient to soften the sizing and also the substance of the quills, and makes them pliable and easy to bend; and also makes them so very soft that when they are bent in that condition they retain their shape. The substance of the quill regains its elasticity on cooling. When a strip of featherbone is heated in this way and then passed through between the cold rollers of the right dimension and size to compress all of the fibers, it crowds all very firmly into a blade and thoroughly incorporates all the featherbone together, so that it has the appearance of forming a continuous cord of the same material. The reduction in temperature causes the material to chill and set in the form desired. The fact that it is wound and stitched does not appear, except on close inspection. The temperature to which the featherbone is submitted, it will be readily understood, is very much higher than the temperature of the human body; the temperature being very near the boiling point, from the fact that the pipe D' is heated by live steam on the outside. We accomplish by this method the result long sought for in the manufacture of featherbone, and have so perfected a superior article in the first place that has much the same appearance of the article which it is intended to supersede—whalebone—and at the same time it possesses all of its own superior qualities—that is, it does not split. It can be sewed through in any direction with indifference with no fear of injuring the texture or quality of it.

"We desire to state that the steps of our process can be considerably

varied without departing from our invention. It is not absolutely necessary to pass the strip of featherbone down into the trough of sizing. The sizing can be applied in other ways so long as the strip of featherbone is saturated. It would not be absolutely necessary to have a special drying-room for the featherbone, and if it is heated in any other way to the required temperature and rolled between cold rollers the same result is attained, though the exact apparatus we have shown is found to be the most effective."

Fig. 1.

Fig. 2.

The claims are:

"(1) A process of manufacturing corset stiffeners consisting in bundling to gether the fibers of quills to form cords or blades; sizing said cords or blades; drying the same; heating the dried sized quills until they are thoroughly softened and applying cold pressure to the same, substantially as set forth.

"(2) A process, in manufacturing corset stiffeners, consisting in bundling the fibers of quills into suitable blades, sizing the same, heating the blades until the fibers of the quills become softened, and applying cold pressure to the same to form the blades, as specified.

"(3) As an improved article of manufacture, an elastic cord or blade comprising the fiber or splints of quills of feathers, wrapping-thread and a sizing, all compacted together and molded to form the fiber or splints, and the sizing being incorporated into a continuous mass, and the thread embedded in the mass as and for the purpose set forth.

"(4) As an improved article of manufacture, an elastic cord or blade, comprising the fiber or splints of quills of feathers incorporated together, and a sizing, all compacted together and molded to form the fiber or splints into a continuous mass, as and for the purpose set forth."

Defenses are set up (1) of anticipations and want of invention, (2) of forfeiture by prior public use, and (3) of noninfringement of the process claims in any view. The record is voluminous, but references to the testimony in the opinion are deemed sufficient without other summary.

Jacob Rothschild and Lysander Hill, for appellant.
Seabury C. Mastick and Chas. K. Offield, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

141 F.—42

SEAMAN, Circuit Judge (after stating the facts). The production of an article which became known as "featherbone," to be used in lieu of whalebone, for "corset stiffeners" and analogous purposes, originated with Edward K. Warren, one of the patentees, in the year 1883. It was then made of quills, or quill splints stripped of the feathers, and bound together forming a rib or stiffener for various articles of dress, as described in letters patent No. 286,749, issued to the inventor, October 16, 1883. Several subsequent patents were obtained for various alleged improvements in methods and product, which are mentioned in reference to this origin of the name "featherbone," in the opinion of Judge Jenkins, speaking for this court, at the present term, in the case of Warren Featherbone Company v. American Featherbone Company, 141 Fed. 513.

The contention in defense of the present suit, however, that the product of this patent (No. 559,827) is identical with that described in the original patent (No. 286,749), or in one or the other of the last-mentioned patents (now expired) does not impress us as tenable. While it is true that quill splints are alike the basic element, thus justifying retention of the name featherbone, the introduction of sizing, reheating, and pressure was a new utilization of that element, and resulted in a new homogeneous material which has attained commercial success. The prior discovery that quills could be used as such element in a substitute for whalebone does not deprive this improvement of recognition as another useful discovery. Nor are we impressed with force in the contentions, either of anticipation of the process claims (1 and 2) in the prior patents introduced, or of noninfringement of such claims in the light of the prior art.

Thus viewing the invention of the patentees as meritorious, we are brought regretfully to the consideration of the evidence of its public use prior to the application for patent. The statute (section 4886, Rev. St. [3 U. S. Comp. St. 1901, p. 3382]) conditions the grant of a patent for an invention that it shall not have been "in public use or on sale in this country for more than two years prior to" the application; and the policy of this provision and its strict construction against the patent are well settled. Egbert v. Lippmann, 104 U. S. 333, 336, 26 L. Ed. 755; 10 Notes U. S. Rep. 176. Nevertheless, the evidence of such public use to defeat the patent must be clear and convincing; and if the rule stated in Morgan v. Daniels, 153 U. S. 120, 123, 14 Sup. Ct. 772, 38 L. Ed. 657, is applicable as well to this issue, every reasonable doubt should be resolved against the defense. While any well-defined case of public use more than two years before the application is filed bars the patent, use "if made in good faith, solely to test the qualities of the invention, and for the purpose of experiment" only, is not within the inhibition. Egbert v. Lippmann, supra. The evidence upon the issue in the present case is voluminous, and the direct testimony is conflicting in reference to the time when practical operations commenced in the use of the patent process. Such use for a year and several months prior to the application is substantially conceded, but the witness Charles K. Warren testifies, in effect, that the process was not perfected until the "summer or fall of 1893"—the application being filed March

5, 1895—and was not used commercially before that time; that all prior use was experimental only, in perfecting the process. Another witness corroborates this view. If this testimony may be credited—not considering the circumstantial evidence and the conduct and interest of the witness—strengthened by the presumptions in favor of patentability, it may be doubted whether the testimony of the 20 or more opposing witnesses, tending to show public use long prior to March, 1893, would be deemed sufficient to overcome its force. We are constrained, however, to the opinion that the evidence, direct and circumstantial, is decisive that the process and product of the patent in suit were in public (commercial) use in the factory more than two years before a patent was applied for, and as early as the year 1887 or 1888; and that the version given by the witness Warren is not only inconsistent with the circumstances and exhibits in evidence, but is further discredited by the stress of circumstances under which it arose, by the indefiniteness of the story, and by the apparent want of candor on the part of the witness.

Review of the evidence in point is unnecessary, as the admission which was ultimately brought out, of public use during and after the summer of 1893, narrows the controversy; and a few of the indisputable facts are sufficient to establish such use beyond the two-year limit. No explanation is offered for this conceded long delay in applying for the patent, and it is surely not unreasonable to infer that it was due to a wish to prolong the period of monopoly, rather than to want of familiarity with such applications. The monopoly under the original featherbone patent (No. 286,749) for the product "formed of quills or quill splints" was then unexpired, and its use by the Warrens was both large and exclusive, while the number of other patents theretofore taken out by these patentees indicated an intimate acquaintance with patent applications. The introduction of glue and the methods of utilizing it to make a new product of quill splints constitute the invention in question. Glue or sizing did not enter into the product of the earlier patents, but the manufacture of featherbone under those patents was continuous and extensive in the factory of the complainant, up to the adoption of the present invention.

Upon these premises a well authenticated series of featherbone exhibits in evidence establishes commercial use of the final invention long prior to the time thus conceded, and beyond possible escape from the limitation. If confirmation of these product exhibits were needful, it is supplied by the cumulative testimony of the witnesses before mentioned in reference to the use of glue in the process of manufacture; and the earlier correspondence between the complainant and certain of its customers, introduced in evidence, is additional confirmation of such use.

In the course of taking testimony for the defense, numerous exhibits of old dress waists or bodices were introduced, containing featherbone used for stiffening, and witnesses were tendered to prove dates and circumstances of making. These exhibits were examined by counsel for the complainant and by the patentee, E. K. Warren, according to a statement appearing in the record, and thereupon this admission was entered of record: "That each and all of the bodice exhibits above

mentioned contains stiffening strips of featherbone, and that the several bodices referred to were all made and used more than two years prior to the filing of the application for the patent here in suit, and that the strips of featherbone that now appear in them were in them at the time when they were so first made and used." None of the witnesses, therefore, were called for authentication of the exhibits. Subsequently the witness C. K. Warren (not the patentee) testified—over vigorous objections—in substance, that the featherbone in all these exhibit dress waists, except two called the "Newberry Exhibits," was made under the old process, and not under the patent, and that the featherbone in the Newberry exhibits was made not earlier than 1896, for reasons stated. Comment on this and other courses in the order and character of the testimony is needless for the present consideration, as the Newberry exhibits referred to were unmistakably identified by several credible witnesses as made in 1887 and 1889 respectively (for occasions which fix the dates beyond doubt) together with a third exhibit made in 1892. It was not only undisputed, but obvious on inspection, that the featherbone in each of the first mentioned exhibits was the product described in the present patent, and entered into the original make of the garments as the witness testified. Without reference to other exhibits and circumstances in the case of like effect, or to the failure of either of the patentees to testify upon this issue when no reasonable excuse appears for their absence, these instances of use are sufficient to defeat the patent.

The defense which was thus made out encountered unfair difficulties in the methods of introducing the various phases of the testimony, in misstatements of fact, direct and indirect, and other devious ways, involving much research and expense in overcoming them, and these means cannot be passed over without censure. Particular mention of one bold instance will suffice. The testimony of the witness Warren in reference to the time when the new process entered into use requires no further comment; but in support of his version, by way of showing the marked departure in the increase of business under the new process at the date so fixed—indicative as well of its advance over the earlier invention—tables were introduced to show the comparative sales of featherbone from the year 1888 to 1902, with a great increase after 1893. The testimony of Edward K. Warren in a prior suit was then discovered and introduced by the defense, and plainly refutes the story of these tables. So that it is now conceded that the tables omitted a very large proportion of the sales of the earlier years. In other words, they were worthless for any legitimate object, and were calculated to deceive; and but for the vigilance of the defense would have deceived the court. None of these censurable means referred to are attributed in any sense to either of the counsel in the case, but we are satisfied that they were devised by Charles K. Warren, the secretary and chief witness for the complainant, and he deserves the censure of the court accordingly.

The decree of the Circuit Court is reversed, with direction to dismiss the bill for want of equity.