**DU PONT CELLOPHANE CO., Inc., v. WAXED PRODUCTS CO., Inc.**

No. 6839.

District Court, E. D. New York.
May 11, 1934.

Nims & Verdi, of New York City (Harry D. Nims, of New York City, C. R. Mudge, of Wilmington, Del., and J. Hanson Boyden, of Washington, D. C., of counsel), for plaintiff.

Watson, Bristol, Johnson & Leavenworth, of New York City (L. A. Janney, E. W. Leavenworth, and D. A. Woodcock, all of New York City, of counsel), for defendant.

Hugh M. Morris, of Wilmington, Del., as amicus curiæ on behalf of Societe La Cellophane of Bezons, France, Kalle & Co. Aktien-Gesellschaft, Wiesbaden-Biebrich, Germany, and Cellophane Company, Limited, of Manchester, England.

CAMPBELL, District Judge.

This is an action brought by the plaintiff for the alleged infringement by the defendant of a trade-mark of the plaintiff, "Cellophane," by using the same in connection with goods not of plaintiff's manufacture, in which plaintiff seeks an injunction.

Plaintiff is a Delaware corporation, and a wholly owned subsidiary of E. I. DuPont de Nemours & Co.

Defendant is a New York corporation, a citizen of the Eastern District of New York, a wholesaler and converter of transparent sheets.

The defendant purchases goods from Sylvania Industrial Corporation, which is one of the plaintiff's principal competitors, and admits that Sylvania Industrial Corporation manufactures the material which was sold by the defendant as alleged in the complaint.

It is admitted by the defendant that attorneys selected and paid by Sylvania Industrial Corporation, and not by defendant, are defending and guiding this suit.

That plaintiff claims Cellophane as its

trade-mark is known to defendant, but on calls for Cellophane defendant sells the product of Sylvania Industrial Corporation as Cellophane, but bills it as cellulose.

In addition to the formal allegations, the complaint alleges that plaintiff owns the registered trade-mark Cellophane, and complains of substitution of merchandise not manufactured by plaintiff on calls for Cellophane, representation that merchandise other than plaintiff's is Cellophane, infringement of plaintiff's trade-mark rights, and facilitation of substitution and passing off by causing transparent wrapping, not of plaintiff's manufacture, to be put up in such a manner as to make it difficult, if not impossible, for the public to identify its source, that defendant threatens to continue these acts, and the damage resulting will be irreparable.

The defendant by its answer denies these essential allegations, both as to ownership of the trade-mark and as to defendant's acts, but admits that the defendant has supplied a product not plaintiff's to customers ordering Cellophane.

The amended answer alleges the following as separate defenses:

(1) Cellophane is the generic name of a product manufactured under certain expired patents; (2) irrespective of said patents, it is the only descriptive and generic name used by the public for this product and plaintiff itself has so used it; (3) if Cellophane ever was a valid trade-mark, it has been abandoned through the descriptive use made of it by plaintiff, and its acquiescence in such use by others; and (4) plaintiff is estopped to deny Cellophane is the generic name of a product.

I find the following facts:

Dr. Little, an American chemist, in the year 1892, knew of film of hydrated cellulose and other material. He actually made it in the same year, in connection with the American Viscose Company and the Cellulose Products Company.

Cross and Bevan, English chemists, applied for and received, in 1894, a United States patent for what they described as "plastic compound of cellulose," and stated that this compound of cellulose might be rolled in sheets, and was afterwards called viscose.

Cross and Bevan, in 1893, applied for and later received a patent for the "modification of cellulose" obtained from the above compound and adapted to be manufactured into sheets. It contained glycerin for softening purposes.

Dr. Cohoe, an American chemist, knew of transparent sheets and the terms "transparent foil," "film," and "sheets."

Dr. Little, in 1897, demonstrated transparent cellulose hydrate sheets which he had made himself at the Franklin Institute, an account of which appeared in the Journal of that Institute.

Dr. Little said that in 1898 "there was an extraordinary amount of industrial interest in viscose all over Europe * * * the properties of the material were exceedingly well known."

Stearn, in 1898, applied for and later received a British patent for the manufacture of a film of cellulose.

Chorley, in 1899, applied for and later received a British patent for making cellulose film.

Little went to England in 1899 to investigate the viscose industry and saw the Chorley process in actual operation, in the Manchester Viscose Company plant, turning out cellulose hydrate films, glycerin being used as a softener, and the material being transparent.

The written report, of 425 pages, made by Dr. Little, which is in evidence, states in part: "The manufacture of continuous films of cellulose has been developed by Mr. Chorley as chemist for the Manchester Viscose Co., Ltd., and a thoroughly practical and well-designed machine has been evolved and is now set up and in operation at the small plant of the company in Manchester * * *." "The most important use which has thus far been proposed for these films is for soap wrappers in place of tinfoil, and the company is in receipt of a request from Mr. A. Pears, who desires to use large quantities of the films, and has expressed his willingness to pay two shillings a pound for them * * *."

The film which Dr. Little saw manufactured in England was substantially the same as that produced by plaintiff to-day.

In his said report Dr. Little recommended the acquisition of the rights to the use of the continuous film machine for the United States, gave complete details of the Chorley manufacture of continuous films, and a drawing of the machine.

Stearn, in 1903, applied for and received a second patent for the manufacture of sheets or films from cellulose, and Dr. Little was acquainted with Stearn and familiar with his patents and processes.

Cross and Bevan, in 1908, manufactured film, and Dr. Cohoe knew of a firm in Lyons, France, making transparent film prior to that year.

The words "film," "foil," "sheets," "cellulose," "viscose," and "transparent" were all part of the English language at that time.

The word "Cellophane" was coined prior to April, 1908, and its first use was as a trade-mark by Blanchisserie et Teinturerie de Thaon, of Thaon les Vosges, France, on its transparent film, which is thus described in an application for a trade-mark registration: " * * * cellulose sheets obtained by the regeneration and transformation of viscose whether transparent, opaque, colored, or uncolored."

Brandenberger, in 1909, applied for and later received two United States patents, one for a machine, describing it as an "Apparatus for the continuous manufacture of cellulose films," and the other for "Manufacture of cellulosic films."

Both were purchased by the plaintiff in 1923, and neither patent mentioned the term "Cellophane."

Euler, in January, 1912, obtained an exclusive sales agency for the French company's product in the United States and Canada.

Shipments were made by the French company to Franz Euler & Company, New York, in the form of rolls of one hundred pieces, three or four rolls to a case.

Later, bundles of five hundred sheets were shipped.

These packages bore a factory label, and sometimes were received in larger bales by Euler, broken up, and the small packages distributed, which packages also bore the factory labels, and sometimes shipments were made directly from the factory to Euler's customers in America, and these also bore the French labels.

Henle Paper Company was one of these customers, and the witness Jacobson was from that concern.

None of the original labels can be found, but they contained the name and address of the French company, Blanchisserie et Teinturerie de Thaon, the word "Cellophane," and French measurements. Jacobson of the Henle Paper Company remembers them, and says that they were similar to the later label which is in evidence as Exhibit 119, and I so find.

This label was identified by Euler as having been first used between August, 1914, and April, 1917. Packages received by Henle Paper Company from Euler, bearing these factory labels, were shipped by that company to its customers with said labels, and without adding any other labels.

Euler did not use any labels of his own which reached the consuming public; he "did distribute some small labels at one time with a slogan on it indicating that the material that was wrapped around that merchandise was La Cellophane."

Blanchisserie registered Cellophane as a trade-mark in France, No. 245, dated March 25, 1912, in renewal of a prior registration made in the year 1908.

Euler applied to register in Class 37, Paper and Stationery, the term "La Cellophane" for parchment tissue, on May 11, 1912.

At that time Euler was the exclusive agent or distributer of the factory for the United States. The factory neither authorized Euler to register the trade-mark, nor even knew of the registration by him. He acted solely on his own responsibility.

Blanchisserie, on August 2, 1912, applied under sections 1 and 2 of the Trade-Mark Act of 1905, as amended (15 USCA §§ 81, 82), based on a French registration No. 245, dated March 25, 1912, to register the word "Cellophane" in the United States as its trade-mark for cellulose sheets, claiming first use in its business since April 11, 1908.

Euler issued a circular to his trade as follows: " 'La Cellophane' (made in France) * * * a transparent parchment tissue paper of the highest merit. La Cellophane is imported only by Franz Euler & Co. * * * who are the representatives for the Cellophane factory of France in the United States and Canada. La Cellophane is registered in the United States Patent Office and infringers will be prosecuted to the fullest extent of the law. Every package or roll bears the Factory's label with the registered trade mark La Cellophane."

Every package or roll carried the factory's label, "La Cellophane."

At first Euler bought his goods in the open market in France.

From the beginning until the purchase by DuPont, the word "Cellophane" was used only as a trade-mark on film sold in the United States by the French manufacturers, and by Euler as distributer, and by no one else except by persons whose use was promptly objected to by Euler, and without exception these persons respected his protest and stopped when objections were made by him.

No film has been sold here at any time under the brand Cellophane, except goods of Blanchisserie and its successors.

Euler always confined the word to the product of this one concern.

Euler filed his trade-mark registration with customs authorities about this time, to protect his interest as importer of this material.

Cross and Bevan's book was published in England in 1912. It stated at pages 161 and 162 (S7): " * * * the manufacture of cellulose film from viscose by continuous processes is a result attained only after long years of persistent study of the exceptionally complex technical problem * * *." "The viscose film (cellulose) under the powerful auspices of the Societe Industrielle de Thaon is at length a fait accompli, and is an article of commerce under the descriptive term Cellophane."

Chemical Abstracts, published by the American Chemical Society, stated at page 2469: "The use of Cellophane for inclosing food substances * * *." "A favorable report to the Minister of Agriculture on this product, which is a thin cellulose membrane * * *."

After 1912, others than Euler imported the material, but they did not get very much of it; that which Birn sold he secured through jobbers in Paris, Belgium, and Germany, as he was not able to buy direct from the French manufacturers at that time, and his business was very limited from 1913 to 1921. The film he imported carried the label "La Cellophane" from the beginning, and was manufactured by the French concern.

Euler began in 1913 to advertise in the Confectioners' Journal, and continued this until January, 1917, and held himself out in such advertising as the exclusive agent of the French factory, pointing out that La Cellophane, described as transparent paper, is "made in France," and in connection with the name, the notice, "Reg. U. S. Pat. Off." In these advertisements, especially the issue of August, 1913, reference is made to the factory labels thus, "See that the factory labels state the quality number."

Candy companies, which prior to this time had used gelatin paper, began to use transparent paper, and witnesses from two such companies testified. The witness Guth produced no specimens of advertising in which the word "Cellophane" appears, and his testimony as to uses is speculative.

There is nothing in the Guth testimony to show any connection of plaintiff with such uses, or that those customers ever used the word "Cellophane" in a manner which would injure plaintiff's rights.

Guth says that when he bought from Birn & Wachenheim he thought he was buying a DuPont product and adds: "I naturally always associated DuPont with Cellophane, * * * they did a great service to anybody that puts out package goods." He thought Sylvania was a part of DuPont's business, but remembers Fenestra as the trade-mark of Birn & Wachenheim.

The witness Hinds, representing Daggett, the other candy manufacturer, testified that they did not begin to use the product before 1919.

The Journal of Industrial and Engineering Chemistry, in June, 1913, under the heading "Cellophane," says: "Mueller regards Cellophane as 'Viscose' of the highest technical importance. The elasticity of Cellophane is said to be remarkable * * *. Cellophane is soluble in water and alcohol * * *."

The Literary Digest of March 7, 1914, describes this film as a "novelty."

The War interfered with Euler's importations, and this is indicated by his advertisements in December, 1914, January, February, and March, 1915.

Birn says that Euler handled practically no Cellophane from the latter part of 1914 to 1921. This is denied by Euler, who says that from 1914 to 1921 they were the accredited agents of La Cellophane Company, and while their imports were restricted between 1914 and 1918, they continued up to 1921, and that he thinks they received all that came over, not during the entire time,' but during the greater part of the time, and is corroborated as to this by Jacobson. Euler protested in writing to Birn & Wachenheim against their use of the trade-mark "Cellophane," and they stopped it.

The French factory did not, between 1914 and 1920, so far as Euler knows, export direct to the United States except to him. After 1919, he also obtained the product of the factory through French jobbers. This product was always sold by Euler as Cellophane. Birn & Wachenheim and Bendix purchased a small amount from jobbers, even while Euler's agency existed. Euler notified competitors to stop the use of the term "Cellophane," and every one of them did so, and adopted trade-marks of their own.

In the New York Times of March 11, 1915, is an article headed "Uses of Cellophane," which states: "Appraisers hold it should not pay duty as gelatin." Impressed with the great variety of uses to which an article known as "Cellophane" is put, the Board of General Appraisers sustained a protest by Franz Euler and Rose & Frank Company

against Collector Malone's assessment on the product. Appraiser Sague reported that: "The merchandise consists of thin sheets of cellulose variously described as cellophane, flexoloid, dramantine, and brilliantine," and stated that its use is a substitute for thin gelatin sheets in wrapping various things.

On December 31, 1915, the time limit of Euler's contract was reached, but his agency relationship with the factory continued.

It was in 1915 or 1916 that Euler first learned of the registration of the trade-mark by Blanchisserie.

From time to time from 1916 to 1923, Birn & Wachenheim, Catty, and Bendix imported some of the product from French jobbers, and, after 1920, sometimes from the factory; but seldom did more than one concern have it at the same time.

They sold it under different trade-marks of their own creation some time during this period; that of Bendix Company being "Bendiphane," Catty used "Glassolyn," and Birn & Wachenheim, "Fenestra."

On March 16, 1916, Laussedat, assignor to the French company, applied for, and in 1917 secured, a United States patent for a label for bottles and other receptacles, stating: "This invention relates to a label made of cellophane * * * ." "The cellophane label could be put over some other label * * * ." "The label could be stuck on the cellophane one." "The label * * * can be made of any other material than cellophane."

Birn & Wachenheim, in 1917, began the use of "Fenestra" as their own trade-name, because, among other reasons, as stated by Birn, Euler had the name "Cellophane" copyrighted, and they did not want to get into any controversy with him. Euler continued to sell, and the demand so far exceeded the supply that advertising became unnecessary. Birn & Wachenheim used the trade-mark "Fenestra" on labels and bills, but they had no film business to speak of until 1921.

Transparent film was used in the French Army and was considered for use in the American Army, the material used here coming from France.

In a number of reports and letters in 1917 and 1918 from different government departments regarding gas masks, the word "Cellophane" was used, sometimes with capitals, sometimes with quotations, and sometimes with a small "c."

A report dated November 10, 1917, in Chemical Warfare Service, vol. 1, part I, p. 6, states: "Cellophane is a French trade name for sheet cellulose * * * ." Again the same statement is found at page 195, part II, of the same volume.

Chemical Abstracts for October, 1919, p. 2490, published by the American Chemical Society, contained an article relating to photography, and used the word "cellophane" with a small "c."

Technology of Cellulose Esters, vol. I, p. 3075, published in 1919, stated: "The viscose sheets of C. Stearn, F. Woodley, Brozykoski, and especially of E. Brandenberger, deserve mention. The product of the latter inventor, under the name of 'Cellophane' has found wide application as a wrapping material for the protection of packages * * * Flexoloid, Biophane, Dramantine, Brilliantine, and Visca are commercial names for similar products."

The witness Hinds, of Daggett Chocolate Company, produced no records, and relied solely on his recollection as to how he used the word "Cellophane" in 1919, but says that in purchases from H. D. Catty Company he used the word "Cellophane," and later when Birn & Wachenheim came along, he called it "Fenestra," which was their trade-name.

On March 18, 1920, Euler sent Pfaltz to France to re-establish his agency with the French concern, which, after seeing Pfaltz, wrote him asserting its ownership of the trade-mark and refusing to continue relations, unless Euler's registration was transferred to it as owner. Euler wrote the French concern refusing to transfer the trade-mark under the conditions stated in the letter of the French concern, which were that it would sell to Euler, but would not give him the agency.

Euler continued to claim rights even against concerns that thereafter were appointed exclusive agents of the factory.

Euler in his advertising in 1921 referred to his registration, and described the product as "transparent wrapper."

Brandenberger, assignor to the French company, on January 25, 1921, applied for, and on February 17, 1922, received, a United States patent for bands of cellulosic material. In the specification he gave "cellophane," printed in this manner with a small "c," as an example of the cellulosic material which might be used in connection with his invention, and used descriptive terms such as "cellulosic material," and "transparent cellulosic material."

Catty was given exclusive agency in the United States in 1921, but Euler thought it

was in 1919 or 1920. Catty sold the French film under the trade-name "Glassolyn."

In the transcript of record of Custom Appeal No. 2135, the protest of Roland Freres used a capital "C" for Cellophane, but in other places the word "cellophane" is sometimes used with a small "c." Catty testified in that proceeding that the product was sold under other names in the trade, such as "Glassolyn," "Fenestra" and "Flexoloid."

Dr. Cohoe, in 1921 and 1922, exchanged letters with his partner, La Meistre, in which the word "Cellophane" was sometimes used with a capital "C," and sometimes with a small "c."

Birn & Wachenheim, on January 1, 1922, obtained the factory agency in the United States, and held it until plaintiff took it over. They imported the genuine material, which from the beginning came wrapped in packages bearing labels marked "La Cellophane," and they resold it as "Fenestra," which they registered as their trade-mark, claiming use since 1917.

The factory printed and distributed through Birn & Wachenheim about 10,000 circulars, dated January 1, 1922, which read: "La Cellophane * * * the ideal transparent wrapper, can be furnished in all sizes, in all colors, in thickness from 0.02–0.12 m. m., plain and embossed. Exclusive sale for the United States, Birn & Wachenheim, 121, 125 West 17th Street, New York City."

The Confectioners' Journal for January, 1922, contained this advertisement: "Societe La Cellophane, France, announce Birn & Wachenheim, 121 West 17th Street, New York, their American agents. Fenestra is the trade name used in America."

There is no evidence to connect the last-recited advertisement with either Euler or the factory; on the contrary, the circular issued by the French company shows that the advertisement was not authorized by it. Euler protested against it. The advertisements by Birn & Wachenheim that followed in later months in the same publication show that they heeded that warning. That the advertisement in question emanated from Birn & Wachenheim is shown by their advertisements in February and March of that year. In October, 1922, they dropped all use of the word "Cellophane" and did not resume it.

One, Lader, bought this material from Birn & Wachenheim while they were agents, and later sold it to Euler, who in turn sold it as "Cellophane." Euler also bought at times from one Schick, who in turn bought from Amecousema, a French jobber.

The Tariff Act of 1922 states (§ 1, par. 1213 [19 USCA § 121, par. 1213]): "Products of cellulose, not compounded, whether known as visca, cellophane, or by any other name * * *."

On November 30, 1922, the Paper Trade Journal contained an article entitled "Cellophane, Its Properties and Methods of Testing," which stated: "Cellophane, which in Germany is called 'Cellulose-Glass Film,' is a product similar to our artificial silk, in the form of a sheet as in paper. * * * A plant has been erected in Germany for manufacturing cellophane which today is made solely by the Societe La Cellophane in Bezons, France." The word "cellophane" is used several times in this article with the small "c."

In 1922 the name "DuPont" had become a most valuable trade-mark, identified with a large diversity of products. The name, in the oval, was advertised as a badge of quality, and many trade-mark names were advertised in connection with the word "DuPont." The DuPont name had a large sales value.

The history of the DuPont oval as a trade-mark is given in the DuPont Magazine of September, 1925, and it had been in use for sixteen years.

The DuPont business was founded in 1802, and in 1925 the company was the owner of many United States registered trade-marks and many foreign registrations, of which the oval was the best known. A number of trade-marks include the word "DuPont" and another word within an oval. In some cases the word used has been claimed as a trade-mark, i. e., "DuPont Cellophane," "DuPont Fabrikoid," and "DuPont Duco"; in other cases the word has been the name of a product, i. e., DuPont Rayon and DuPont Dyestuffs.

Prior to August in the year 1923, the DuPont interests and the French interests owning the Thaon factory arranged to join forces and begin the manufacture of the material in America, and for this purpose a corporation, plaintiff's predecessor of the same name, was organized in June. In the corporation charter the word "cellophane" was spelled with a small "c." The new corporation acquired the two Brandenberger patents, one for "Improvement in Apparatus for the Continuous Manufacture of Cellulose Films," and the other for "Improvements in or Relating to the Manufacture of Cellulosic Films," also the registration by Blanchisserie of the name of "Cellophane."

By this arrangement the French interests' patents, the trade-mark "Cellophane," and

their business of exporting film to the United States, the certificate of registration, together with the good will of the business in connection with which said trade-mark is and has been used, were assigned by the French concern to plaintiff's predecessor, on October 13, 1923, and the assignment was recorded November 10, 1923, in the Patent Office.

In August, 1923, DuPont Cellophane Company, Inc., announced: "That as of August 1, 1923, they have secured the exclusive sales and manufacturing rights of the product known as Cellophane, and manufactured by La Cellophane, of Bezons, France. We are now importing this product and all inquiries will receive our prompt attention * * * ."

This advertisement appeared in the August and September numbers of the Manufacturing Confectioner.

In August, 1923, Euler's attorney wrote the new corporation regarding his trade-mark claims. The letter is not in evidence, but the reply to it is in evidence, in which its attorney made plain its position, and in the concluding paragraph of that letter said: "However, we feel that in the assignment now being executed by the Blanchisserie et Teinturerie de Thaon to the DuPont Cellophane Company, the latter will acquire in this country the right to the use upon its products of the trade mark Cellophane, and we are prepared to protect our rights."

A period of development of three or four years followed the organization of the DuPont Cellophane Corporation, in which the corporation built its factory and devoted its attention to improving the quality and uniformity and reducing the cost of the product. Production in the new plant at Buffalo began in 1924, but during the development period the output was comparatively small.

Plaintiff began to use the DuPont oval device with the brand Celophane in it on its goods, at first without a registration notice, but following the registration of the mark in 1924, with the notice, "Reg. U. S. Pat. Off.," which has been used consistently ever since.

The DuPont Magazine of October, 1923, contains an article headed "Cellophane—A New DuPont Product," subtitle "The DuPont Cellophane Company will manufacture it at Buffalo, New York."

In this article the word "cellophane" is used with a small initial letter. It is called a "transparent cellulose product," and states: "The DuPont Cellophane Company has obtained the patent rights for North America, and pending the completion of its factory at Buffalo, will be the selling agents in this country for the product which the company is now importing. It is expected that the new factory will be completed in May or June of next year."

In the same magazine for December, 1923, appears another article "That New Wood Product—Cellophane."

In this article the name is used with a small letter.

Euler continued his advertisements in the Confectioners' Journal, in November, 1923, January, February, and March, 1924: "La Cellophane—(Reg. U. S. Pat. Off.)—The peerless transparent wrapping paper."

Euler sold very little of it after August, 1923.

Plaintiff on December 28, 1923, applied for registration of the DuPont oval Cellophane trade-mark for "cellulose sheets obtained by the regeneration and transformation of viscose, * * * " in which application the word "cellophane" was used with a small "c." In the file wrapper for the same registration, Cellophane appears with a capital, and is referred to as a "trade mark."

The word "Cellophane" was not considered descriptive in this application, and that is shown by the fact that no disclaimer of the word "Cellophane" was made. Where such descriptive words as "Fibersilk" and "Rayon" were included in registrations with the word "DuPont," such registrations carried disclaimers of the descriptive word.

Birn, testifying in a customs case, stated that he did not sell film in this country under the name "Cellophane," that he dealt in "Fenestra," and that "Cellophane," "Fenestra," "Bendiphane," "Glassolyn" were trade-names relating to the same article.

Plaintiff spent only about $500 for advertising in 1923.

"Transparit," a cellulose hydrate film imported from Germany, was alleged to be first sold here on January 1, 1924. This material was sold in competition with Cellophane, and the competition was substantial. It was sold as transparent wrapping paper, under the trade-marks "Transparit" and "Krystal Klear."

Yerkes, on January 24, 1924, filed an amendment to his company's application for registration of the DuPont Cellophane oval trade-mark, in which "cellophane" is used several times with a small "c."

Yerkes testified that: " * * * this document was prepared by the legal department and signed by me as a matter of course. I have no distinct recollection of what I meant

by signing any of this. This was done in a routine way by the patent or trade mark attorneys in Wilmington, and was sent over to me for signature. * * * I think obviously whoever wrote this document was responsible for it. * * * It was written by somebody writing for this application in the Patent Office. I didn't write it. I signed it but I certainly did not dictate it."

Another amendment was filed by Yerkes on February 13, 1924, to the same application, using a capital "C," and describing the word as a "trade mark." "We also note that our application is rejected on the registration No. 92036 * * * for the trade mark 'Cellophane' * * * which had been assigned to plaintiff in 1923." Subsequent office letters and amendments also refer to "Cellophane" and the trade-mark "Cellophane."

The Literary Digest, on February 2, 1924, carried an article entitled "Cellophane: A Substitute for Paper," stating: "A substitute free from these defects is cellophane, a French invention, which is being increasingly used abroad and is making its way in this country."

The defects referred to were the defects of wax paper and gelatin.

Euler, on February 14, 1924, assigned his good will and rights in the word "Cellophane," which he had used as the importer of the French product, to plaintiff, the American successor of the French concern, but did not sell any physical assets.

After the sale, Euler continued to buy from plaintiff and sell as a distributer for plaintiff.

DuPont Cellophane Company imported film from the French factory until toward the summer of 1924, when the factory at Buffalo was completed.

On April 17, 1924, "Paper" stated that Cellophane is: "A product made of a specially treated paper or pulp, somewhat resembling glassine; made from a bibulous waterleaf similar to that used for artificial silk or vegetable parchment."

In July, 1924, DuPont trade paper advertising was begun (except for two announcements in the previous year). In all the trade paper advertising from July, 1924, on, the word "Cellophane," whether used with "DuPont" or not, has been spelled with a capital "C."

On July 22, 1924, the registration of the DuPont oval with the word "Cellophane" within it was granted.

In August, 1924, the advertising of the plaintiff contained the DuPont oval Cellophane trade-mark, and stated: "The New Super Wrap is Now Available for your Holiday Line." The description "New Super Wrap" is used; also the term "Cellophane-wrapped." The advertisement states: "The plant shown above has just been erected at Buffalo, N. Y., by the DuPont Cellophane Company. It is now supplying American Manufacturers with the beautiful protective wrapping material that for years has been manufactured in France * * * ."

Various concerns issued advertising containing the word "Cellophane," in phrases such as: "Transparent La Cellophane display top." "Wrapped in Cellophane." "Cellophane Package." "Wraps of Cellophane."

During the year 1924 the plaintiff published a total of twelve advertisements in four different trade publications. (No advertising was done in 1924 to the public.) In the advertisements the DuPont Cellophane oval device was prominently displayed (but without registration notice, registration not having been granted until July 22, 1924). Various descriptive terms were used: "Protective wrapping material." "Super-wrap." "This wonderful new DuPont wrapping material." In the October Perfumers' Journal: "Cellophane, the superior wrapping material, hitherto obtainable only from France in limited quantities, is now available to the American Perfumer * * * ." "The modern, new factory, shown above, has recently been erected at Buffalo, N. Y., by the DuPont Cellophane Co., Inc., and from now on will assure a steady supply as well as maintain the uniform quality of Cellophane."

In September, 1924, the Dictionary of Tariff Information, United States Tariff Commission, stated: "Cellophane and visca are cellulose products, precipitated from the plastic solution of chemically dissolved wood pulp or cotton. Cellophane, sometimes called fenestra paper, flexaline, flexoloid, brilliantine, dramantine, glassolyn, and cellulose glass film, in its simplest form resembles in appearance and texture manufactures of gelatin, photographic films, or thin sheets of isinglass."

An article appeared in the November, 1924, DuPont Magazine, page 6: "'Cellophane'—the Super Wrap." This is the third article in this magazine relating to Cellophane. In it, and thereafter almost without exception in this magazine, the word is used with an initial capital letter. It speaks of it as "'Cellophane,' the super wrap," "a wrap

of cellophane," and shows a diversity of its uses. In the December, 1924, DuPont Magazine the fourth article appeared, in which it was described as a "super wrap." Throughout the article the capital "C" is used. The file of this magazine contains only two articles on transparent film, using "cellophane" with a small "c," and both of these were in 1923, just after the plaintiff was organized.

The October, 1924, Scientific American stated: "In making cellophane the viscose passes into a manifold. * * * It is a perfectly transparent resistant substance. * * * All the cellophane that has hitherto been used in this country has come from France, but now announcement has been made that an American company has succeeded in devising a process for making this substance in America."

In the year 1925, plaintiff published a total of two hundred and twelve advertisements in twenty-five different trade publications, in which the DuPont Cellophane oval trademark was prominently displayed. Following the granting of the registration, a notice of registration was constantly used. Descriptive terms appear throughout these advertisements such as: "Cellophane is a new and unusual wrapping material of absolute transparency," "transparent material," "transparent wrap," and "transparent wrapping."

In March, 1925, DuPont advertised "Cellophane is a new and unusual wrapping material of absolute transparency, strong," etc. Also: "Cellophane is a new wrapping material—unusual because it is absolutely transparent," etc. In the same advertisements appears the DuPont oval; always, after September 5, 1924, with the registration notice.

In 1925 plaintiff's "direct mail" advertising began, i. e., printed matter distributed by mail. All carried the Cellophane oval, also various trade-mark notices. The distribution of this "direct mail" material has continued to the present time. The specimens in evidence are merely typical, as it would require too much space to show samples of all of it. Much of the advertising matter which was inclosed in these "direct mail" letters was reprints of Cellophane advertisements from trade or consumer publications, in all of which notice of trade-mark was clearly shown.

In 1925, Wolff & Co., Walsrode, Germany, applied to register the word "Transparit" for cellulose hydrate films, claiming use since January 1, 1924, and it was granted. This product was sold here in competition with Cellophane.

In 1926, plaintiff began to advertise to the public. It placed seven advertisements in the Literary Digest, which carried Cellophane in the oval and registration notice. The material was described as "outer wrap," "sparkling wrapping material," "transparent wrapping," and "transparent protective wrapping material." Plaintiff's advertising contained warnings.

In 1926, plaintiff published one hundred and sixty-three advertisements in fifteen different trade publications, and in all of them the DuPont Cellophane oval with the registration notice was displayed. Cellophane was described as "new wrapping material," "crystal-like wrap," "protective wrapping material," "wrapping material, unusual because it is absolutely transparent." In four issues plaintiff's notice read: "DuPont Cellophane is an unusual material, patented and trade marked, used for wrapping and many other purposes," etc.

Plaintiff advertised a "Booklet—Your product is a showcase of its own," describing this unusual wrapping material.

Beginning in 1926, plaintiff's labels uniformly contain the following statement, in addition to the oval with the registration notice: "This package is sold subject to the express license restriction to which each purchaser agrees by the acceptance hereof, that no purchaser shall resell the contents whether cut to size or not, except under the registered trade mark name 'DuPont Cellophane' * * *."

In 1926 the Celluloid Company claimed to have used the word "Protectoid" for acetate film since April in that year.

In 1926, the Henle Company, New York, commenced selling, in competition with Cellophane, under the names "Transparit" and "Krystal Klear," a cellulose hydrate film made by Wolff & Co., Walsrode, Germany.

Plaintiff warned advertisers to respect its trade-mark rights in the word in their advertising (see Exhibit 128).

DuPont's business really began to grow in 1927.

Its advertising was extended to the Saturday Evening Post, in which, beginning in February, 1927, plaintiff inserted half-page advertisements in eight different issues. Each contained the following: "Cellophane is the registered trade mark of DuPont Cellophane Company, Inc., to designate its transparent cellulose sheets and films."

The DuPont Cellophane oval trade-mark was prominently displayed and, with the exception of the first two, the "Reg. U. S. Pat.

Off." notice was used. Various descriptive terms were used, "transparent wrapping," "transparent protective wrapping material," "glistening protective wrapping." These half-page spreads were circulated to the extent of about 21,000,000 insertions, the circulation of the Post being something like 2,700,000.

Early in 1927 DuPont began to use the notice, "Cellophane is the registered trade mark of the DuPont Cellophane Company, Inc., to designate its transparent cellulose sheets and films," in all of its advertising, including "direct mail" and on its labels and letterheads. This notice has been used continuously down to date. Red ink was often used to print this and the registration notice.

The Cellophane labels, from this date on, have carried the DuPont Cellophane oval trade-mark with the "Reg. U. S. Pat. Off." notice, the provision that the product should be resold under the registered trade-mark "DuPont Cellophane," and "Cellophane is the registered trade mark of DuPont Cellophane Company, Inc., to designate its transparent cellulose sheets and films."

Plaintiff continued in 1927 its trade advertising in seventeen trade publications, in which the oval trade-mark, with registration notice, was prominently displayed, as was the notice, "Cellophane is the registered trade mark of DuPont Cellophane Company, Inc., to designate its transparent cellulose sheets and films"; both often being in red ink.

The plaintiff also continued in 1927 direct mail advertising, which was mailed with letterheads carrying trade-mark notices referred to above in red ink, and there was also included therewith price lists, which from 1927 to date have carried the notice, " 'Cellophane' and/or 'DuPont Cellophane' are the registered trade marks of DuPont Cellophane Company, Inc., to designate its transparent cellulose sheets and films," together with a prominent display of the DuPont Cellophane oval trade-mark with the "Reg. U. S. Pat. Off." notice. Numerous pieces of advertising matter were mailed to customers and prospective customers.

Plaintiff's advertising to the public was extended in 1928 to full-page space and the use of two colors. For specimens of consumers' advertising see Exhibit 47, and for trade advertising see Exhibit 41.

Five issues of the Saturday Evening Post, March, May, June, September, and November, 1928, were used. The circulation of the Post was approximately 2,700,000.

The total appearances for this advertising was 13,500,000. In this advertising, the word "Cellophane" is prominently displayed in juxtaposition with the oval and the two trade-mark notices. In three instances the oval is in red ink.

The product is described as "transparent wrapping," "transparent sheets," etc.

Birn & Wachenheim were selling in 1928 film under the name of "Fenestra," which they described as "transparent wrapping."

The Celluloid Company claimed to be selling film under the name of "Protectoid," which name it registered in August, 1928.

Modern Packaging refers to film of various manufacturers as "transparent wrapping," "transparent paper," "transparent covering," "transparent cellulose wrapper."

Cellophane was now being used as a wrapping in over thirty industries, and companies using it began to refer to it in their advertisements.

Prior to 1928, there had been some use of the expression "wrapped in Cellophane," but it was not until the plaintiff's consumer advertising had become effective that such expressions became general. In 1928, many customer advertisements and articles in public press referred to Cellophane, some with the small initial "c," and others with the capital "C." The customers' advertising, in the period 1927–1932, reflects the increasing uses for plaintiff's material, and the desire of users to take advantage of its popularity by advertising their products as "Wrapped in Cellophane," "Cellophane Wrapping," and the like.

Plaintiff began in 1928 to check such advertising, and where errors came to its attention, to make every effort, through correspondence and direct approach, to get the trade to indicate that Cellophane was not a common word of the language. They asked to have it italicized or underscored, or used with all capitals in a distinctive form. They did not attempt to describe details. Plaintiff always wished to have the word Cellophane in customer advertising spelled with a capital "C," or quoted, or distinctively marked, because it wanted it identified as a trade-mark, and wanted them to use it so it would appear as a trade-mark.

Plaintiff's president stated the policy of his company to be as follows:

" * * * our policy has been to attempt in every way to get them to use the word Cellophane as it should be used * * * and as we thought it should be used * * *. We thought it should be used as a trade mark

name and we endeavored, where customers did use the word Cellophane, to get them to use it as such * * *. We wanted them to show in some way that it was a trade mark name of our product * * *. We endeavored, either by mail or by personal contact, to impress the customer with the fact that this was our trade mark name and get him to respect it."

"We tried to get him to respect the fact that this was our trade mark name. * * * We tried through our sales organization to get customers who advertised their product with Cellophane, with the word Cellophane, to use the word as we wanted him to use it. * * * The policy of the company, broadly speaking, was to have this word respected, and so far as I know an endeavor was made to do that." The use of a small "c" was not compatible with plaintiff's policy.

The plaintiff asked Modern Packaging to capitalize the letter "C" in Cellophane, and not use it with a small "c." Modern Packaging, after plaintiff protested, used the term (editorially) "transparent cellulose sheetings" or "transparent cellulose wraps."

Numerous letters were written to stores, newspapers, magazines, and others, protesting against the use of the word Cellophane except as a trade-mark; the following being illustrative of the form of notice which was given in all of these letters, viz.: "Our legal department wishes us to point out, however, that Cellophane is a registered trade mark, not a generic term, and therefore should be spelled with a capital 'C.'" The letters were written on plaintiff's regular letterheads, which carried the notice in red: "Cellophane is the registered trade mark of DuPont Cellophane Company, Inc., to designate its transparent cellulose sheets and films."

It was not the policy of the plaintiff to ask its customers not to use the words "DuPont Cellophane," nor was it the policy to ask them habitually to use the DuPont oval. Plaintiff wanted the word Cellophane in customer advertising identified as a trade-mark.

The company's policy was to follow this plan diligently. It did not attempt to drive its customers out of business. It was not a part of the company's policy to refuse to sell people who would not use the word Cellophane in their advertising as the company wanted it used. There was not a specific list of do's and don'ts, but from the early days of plaintiff's business, letters were written, etc., to agents and various people that Cellophane was the plaintiff's trade-mark.

It was against trade practice to try to compel customers to advertise reference to the trade-mark character of the word Cellophane. "It is good advertising practice and common advertising practice to use a trade name with a capital letter, or all capitals, or in quotation marks, or in italics or underlined, for instance, taking the trade name Duco, or Kodak, or Vapex; that is what is common advertising."

It would be presumption for plaintiff to ask its customers to advertise the word Cellophane accompanied by the word "trademark."

It would not be good business practice, because it would be asking the customer to spend his advertising money and detract from his own advertising effort. The customer would have been glad to do it, if plaintiff had paid part of the cost, and plaintiff had plenty of offers of that sort.

Tilney, of General Baking Company, called by defendant, testified that if the Sylvania Company asked him to advertise "Sylphrap" in his advertising, he would not do it, because " * * * we are selling bakery products, not wrappers."

Plaintiff in 1929 inserted six full-page, two-color advertisements in the Saturday Evening Post. The two trade-mark notices were always used, also descriptive terms, as "modern wrapping," "scientific wrapping material," "transparent wrapping material," "transparent cellulose sheets and films." Plaintiff, in 1929, also published trade advertisements in seventeen different publications, in which the word Cellophane appeared with the two trade-mark notices. Descriptive terms used were "modern wrap," "wrapping," "transparent wrapper," and "material for wrapping." Direct mail advertising was carried on in 1929, and the trade-mark notices above referred to were employed throughout.

In January, 1929, a pamphlet entitled, "The Modern Merchandising Aid," was sent out. It said: "This new factor is the sparkling, transparent wrapping material which is seen everywhere as a wrap on candy boxes and many other products of all descriptions. It is DuPont Cellophane. * * * The word Cellophane is not a generic term, but is the registered trade mark of the DuPont Cellophane Company to designate its transparent cellulose sheets and films."

April 1, 1929, plaintiff succeeded to the business of the corporation of the same name formed in June, 1923. The certificate of incorporation was obviously copied from the certificate filed in 1923, and used the small

"c." The object clause states the purpose to be: "To manufacture, buy, sell, import, export, ask, prepare, treat, finish and in all ways handle and deal in cellophane, transparent wrapping material, viscose products, textiles, fabrics, materials and articles manufactured from viscose or nitro-cellulose, or of materials or articles entering into composition or manufacture thereof * * * ."

June 11, 1929, plaintiff's attorney wrote to the Commissioner of Patents, that Cellophane was the registered trade-mark of the plaintiff, and cited the trade-mark registration, and requested that examiners be instructed not to permit the use of the term in patent specifications.

June 21, 1929, the chief clerk of the Patent Office replied that the Patent Office could not undertake to supervise the terms used by applicants for patents, to the extent of excluding trade-marks from the description in patent applications.

September 1, 1929, Birn & Wachenheim sold their business to the Sylvania Industrial Corporation. The trade-mark "Fenestra" of Birn & Wachenheim was well known before this sale. When Sylvania entered the field, there were four companies manufacturing transparent material, which was sold, as follows: DuPont "Cellophane," Sylvania "Fenestra" and "Sylphrap," Eastman "Kodapak," and Celluloid Corporation "Protectoid." Newark Paraffin & Parchment Paper Company sold an acetate sheeting under the trade-name "Aquatone." Other transparent film was sold as "Transparit." The descriptive terms used for all these products were "transparent wrapping material," "transparent cellulose," and the like. Kodapak is not the same as Cellophane technically, but is practically. Kodapak is cellulose acetate; Cellophane is cellulose hydrate; Protectoid and Aquatone are also acetate products. These various trade-marks are registered. Henle Waxed Paper Manufacturing Company sold "Transparit" under its own trade-mark "Krystal Klear" as "transparent wrapper." Kodapak and Protectoid are the same as Sylvania and DuPont products, so far as the general usage is concerned.

August 9, 1929, in an interview published in the New York City Journal of Commerce regarding the plans for Sylvania's new plant at Fredericksburg, Va., Dr. Wallach, Sylvania's president, is reported to have stated: "In this plant we are going to manufacture transparent paper similar to the imported and domestic types which are known under the trade names 'Fenestra,' 'Cellophane,' etc."

October 28, 1929, Hopkins, of plaintiff's legal department, warned Sylvania against using "Cellophane." Dr. Wallach replied November 2, 1929, and stated: "We have no intention of using the word Cellophane either by itself or in conjunction with our company's name, nor to in any way interject the slightest difficulty in your continuing to do so as long as it does not interfere with our doing business and marketing our products under our own trade mark."

November 1, 1929, Birn & Wachenheim and Sylvania Industrial Corporation announced that Sylvania had acquired the business of Birn & Wachenheim, and would continue to import Fenestra until after the completion of its manufacturing plant at Fredericksburg, Va. The word "Cellophane" was not mentioned. This was followed by an announcement on November 27, 1929, referring to many inquiries received from customers and friends, asking, "When we will be able to supply transparent cellulose sheets," and stating that pending the construction of the new plant, "meanwhile our ability to import the present grade of Fenestra permits us to rush the completion of the first unit for the production of our moistureproof Fenestra under a new process of our own." The word "Cellophane" was not mentioned.

Sylvania instructed its advertising agents to use the generic term "transparent cellulose sheets" or "wraps" for its product, and such a description appeared in all advertising.

Webster's New International Dictionary carried the following definition of "Cellophane": "Viscose solidified in thin transparent waterproof sheets or strips, bearing the trade mark Cellophane. It is used for wrapping confectionery, ornamental novelties, surgical dressings and the like. * * * "

In 1929 plaintiff wrote letters to users and publications calling attention to the fact that "Cellophane" is its trade-mark, and protesting against misuse of the word.

In the year 1930, plaintiff extended its customer advertising to seven issues in the Saturday Evening Post, and went to four colors. The word "Cellophane" was prominently and distinctively displayed in association with the name "DuPont," in all of these advertisements. The plan inaugurated in 1927, of using a trade-mark notice including a descriptive term, was continued, and every advertisement carried the notice, "Cellophane is the registered trade mark of DuPont Cellophane Company, Inc., to designate its transparent cellulose sheeting," as well as

the registration notice often in red ink. Descriptive terms such as "wrapping," "transparent wrapping," and "wrap" were used.

The circulation of the Saturday Evening Post was over 2,900,000, making a total of 20,300,000 appearances of these advertisements.

In 1930 there were 129 insertions of trade advertising by plaintiff in sixteen different publications, all of which carried the trade-mark notices hereinbefore referred to. In addition, descriptive terms were used throughout this advertising, such as "wrap," "modern wrapping," "wrappers," etc., and in many of the advertisements the name "DuPont" was associated with the trade-mark "Cellophane."

March 25, 1930, plaintiff registered DuPont Cellophane in oval for caps and bands, etc., No. 269,030, and the DuPont Cellophane in oval with the word "Moistureproof" beneath the oval, for moistureproof cellulose sheets, etc., No. 269,111. In neither of these registrations was the word "Cellophane" disclaimed as being descriptive.

Beginning with 1930 and running down to date, Sylvania has published numerous advertisements in trade papers which contain such expressions as "Sylphrap, the finest transparent cellulose sheets," "Sylphrap, the aristocrat of transparent wrappers." In many the "Sylphrap" and "Nymphrap" labels were displayed reading: "Sylphrap—quality's best attire—Reg. U. S. Pat. Off.—Transparent cellulose paper," and "Nymphrap—Extra—Quality's moistureproof protection—Reg. U. S. Uat. Off.—Moistureproof transparent cellulose paper."

In none of these advertisements has the word "Cellophane" been used.

Prior to this date Sylvania attempted to imitate Cellophane by use of "Sylphane." DuPont protested and filed an opposition, on the ground of its resemblance in sound to "Cellophane." Wallach, Sylvania's president, wrote plaintiff: "In view of your present exclusive use of what we consider your real trade mark, viz., 'DuPont Cellophane,' we frankly admit that this possibility had not occurred to us. However, we are just as anxious as yourselves not to have any such confusion occur, even if only in your own mind. In conformity with our letter of November second, 1929, we take pleasure in advising you that contrary to legal advice, we will allow the date of June third to pass without contesting your opposition."

Hatt, plaintiff's general manager, replied June 5th, stating: "We appreciate very much the spirit expressed in your letter on this subject, and assure you that your position in this matter is very gratifying to us. * * * "

May 25, 1930, Sylvania applied for registration of the word "Sylphrap" as a trade-mark for sheets made of regenerated cellulose in Class 1, Raw or Partly Prepared Materials, claiming use since May 16, 1930, and registration No. 276,127 was issued on October 7, 1930. The word "Cellophane" was not mentioned. Sylvania on its labels and in its literature has never used "Cellophane," but always such terms as "transparent cellulose," "transparent wrapping," "transparent cellulose paper," "transparent wrapper," "transparent cellulose sheets."

The Mirror Candy Company, in its interoffice requisitions, orders, and receipt book, used the word "Cellophane," but the material was supplied by Sylvania.

The direct mail advertising of plaintiff for the year 1930 carried the two trade-mark notices in red ink at the top of letterheads. The price lists for the year 1930, on the front page and prominently displayed, carried the notice: " 'Cellophane' and/or 'DuPont Cellophane' are the registered trade marks of DuPont Cellophane Company, Inc., to designate its transparent cellulose sheets and films." Also: " 'Cellophane' and/or 'DuPont Cellophane' is sold subject to the express license restriction to which the purchaser agrees by the exhibit thereof, that no person shall resell it either in the delivered sizes or cut to smaller sizes except under the registered trade mark names 'Cellophane' and/or 'DuPont Cellophane.' * * * "

Plaintiff continued to notify users that Cellophane is its trade-mark, and to protest against its misuse.

In 1931, plaintiff continued its advertising campaign in the Saturday Evening Post. Eight four-color pages were used. Good Housekeeping Magazine was added, with five four-color pages. The circulation of the Saturday Evening Post in 1931 was over 2,900,000, and of Good Housekeeping over 1,700,000, and the total of advertising messages in these two publications was well over 32,000,000. The two trade-mark notices appeared in all of the advertising. Descriptive terms, such as "Modern wrapping," were used.

In 1931, advertisements appeared in twelve different trade publications with the trade-mark notices above referred to, and descriptive terms such as "wraps," "wrapping,"

and the like. Some space was devoted to the moistureproof material.

Direct mail advertising contained and carried the trade-mark notices throughout, and descriptive terms such as "transparent wrapper," "wrap," "transparent protective sheeting," were used. Some of the mail matter carried a label reading: "Cellophane being a registered trade mark of the DuPont Cellophane Company and not a generic term should be spelled with a capital 'C.' We will appreciate your cooperation in this respect."

March 25, 1931, plaintiff's attorney wrote the Commissioner of Patents, protesting against use of "Cellophane" in patents.

April 28, 1931, the Commissioner of Patents replied that in his judgment the fact that the specification writers employ trademark names in their specifications will not endanger trade-mark rights.

In July, 1931, defendant began handling cellulose sheets which it bought from Sylvania. The material sold by defendant was billed and labeled "cellulose," because, as defendant's secretary said, "cellulose was the descriptive name for the article." Defendant was told by Sylvania at the outset not to use "Cellophane."

Defendant offered patents in evidence in some of which the word Cellophane is spelled with a small "c," and in others with a capital "C," or in quotations. In three of these patents which issued with the word "cellophane" spelled with a small "c," the applicant used a capital "C." In another, the file wrapper showed that the examiner stated to the applicant, "The word 'Cellophane' is trade marked and cannot therefore be used in the specifications," to which the applicant replied, "The word 'Cellophane' is capitalized in the specification and its use is, therefore, believed to be entirely proper." The patent issued accordingly.

Plaintiff offered in evidence sixty-six patents granted by the Patent Office in which the word "Cellophane" was not used, and in which descriptive terms were used such as "Films of cellulose," "Cellulose hydrate," "Viscose film," "Transparent wrapper." Another group of nineteen patents granted by the Patent Office offered in evidence set off the word Cellophane in quotation marks, or in capital letters, thus designating it as a trademark according to the rules of the Office.

Yerkes, president of the plaintiff, signed an affidavit in connection with a "Petition to make Special," filed in Charch & Prindle's application for Patent No. 1,826,699, October 6, 1931, relating to "a method of moisture-

proofing transparent materials, such as transparent sheets or films of regenerated cellulose." In this affidavit it is stated: "Du-Pont Cellophane Company, Inc., is engaged in the manufacture of Cellophane, which is a transparent wrapping material consisting of sheets of regenerated cellulose." "DuPont Cellophane Company, Inc., is the originator of moistureproof Cellophane which is a thin transparent wrapping material, having moistureproof properties many times in excess of the best waxed paper."

Pritchard, plaintiff's patent attorney, in the same application also signed an affidavit in which it is stated: " * * * Said Charch & Prindle application number 534,688 is one of a series of five applications pertaining to the manufacture of moistureproof Cellophane * * *. I am very familiar with the art relating to moistureproof Cellophane * * *. DuPont Cellophane Company, Inc., has been engaged in the manufacture of Cellophane since 1924. * * * Unless the rights of my client can be promptly adjudicated it will suffer great damage not only by the present infringer but also by others who are contemplating engaging in the manufacture of moistureproof Cellophane in infringement of my client's rights * * *."

The word "Cellophane" was used with a capital "C" throughout these affidavits, which shows an intent to use the word as a trademark in accordance with the Patent Office rules. The word was obviously misused in the eleventh paragraph, and the only explanation therefor is the mistake of the person who drew the affidavit. In 1931 and 1932, numerous advertisements of users of transparent cellulose film appeared, in which the material was described as "transparent cellulose papers," "transparent wrapping," and the like. In June, 1931, in Modern Packaging, an advertisement of an automatic packager refers to "Sylphrap or other transparent cellulose papers," and to "Cellophane or other transparent cellulose papers."

Plaintiff continuing its policy of protecting its trade-mark wrote many letters calling attention to the fact that "Cellophane" was its trade-mark and protesting against incorrect uses of it.

In 1932, eight full-page four-color advertisements were run in the Saturday Evening Post, and five in Good Housekeeping. Each of these advertisements also carried the statement, "Made only by DuPont," immediately beneath the word "Cellophane."

In addition to the Saturday Evening Post and Good Housekeeping, the plaintiff, in

1932, ran four full-page four-color advertisements in the Ladies Home Journal, similar to those in the Saturday Evening Post and Good Housekeeping, with the two trade-mark notices, and the expression, "Made only by DuPont."

The total number of advertising messages in these two publications was over 40,000,000.

Trade paper advertising was carried by fourteen different publications in seventy-eight insertions, with the phrase, "Made only by DuPont," and the two trade-mark notices. Descriptive terms were used, such as "Modern wrap," "Transparent wrap," etc.

The direct mail campaign was continued, using the two usual notices. The material was referred to as "Transparent wrapping," "Wrap," and "Transparent material."

Plaintiff filed oppositions to applications for trade-mark registration of words similar to Cellophane. In all, except two not yet determined, the applications were either withdrawn or the opposition sustained.

February 26, 1932, booklet of advertising by customers, featuring Cellophane, was distributed by plaintiff. In a few instances a small "c" was used in the reproduced advertisements.

In May, 1932, the Eastman Kodak Company registered the word "Kodapak" as a trade-mark for "thin transparent sheeting of cellulose composition," claiming use since June 15, 1931.

May 24, 1932, the Official Gazette of the Patent Office published a notice urging care in use of trade-mark names.

August 10, 1932, plaintiff protested to Wrigley regarding the latter's use of the word "Cellophane." Mr. Wrigley testified: "The DuPont Company called it to our attention, that the word was a trade mark word * * * ." He had seen DuPont's advertising for four years. He noted it was "written in a certain style" during the four years which he had observed their advertising. The particular style he referred to is: "The 'C' is rather prominent." Wrigley never advertised any one else's product or trade-marks. Plaintiff wrote to Webster, advertising manager of Wrigley: "Our legal department has asked us, however, to point out to you the omission of a capital 'C' in the name 'Cellophane' as it is being used in your poster campaign," and added, "is not a generic term but the registered trade mark of the DuPont Cellophane Company, and therefore should be spelled with a capital initial letter as with any proper name." In reply Webster noted what was said about the use of the capital "C" in

the name "Cellophane," and stated: "We were not aware of this feature and will see that all our artists are advised of it pronto."

Plaintiff protested against the Camel and Lucky Strike advertising.

In September, 1932, Modern Packaging, a glue company, stated: "Cellophane, Kodapak, Protectoid, and Sylphrap—any transparent cellulose film—plain or moistureproof —may be well sealed."

The label used by Sylvania referred to moistureproof Sylphrap, the modern and ideal transparent moistureproof cellulose paper.

Plaintiff, in 1932, continued its policy of writing letters referring to "Cellophane" as its trade-mark, and protesting against incorrect uses of the word.

This suit was commenced in February, 1933, and no consumer advertising for the year appeared until March.

Trade advertising was begun in January, in seven different publications, and carried the usual two trade-mark notices and the words, "Made only by DuPont." Direct mail advertising was continued with the usual trade-mark notices.

The price list effective January 11, 1933, was announced in an accompanying letter as the fifteenth Cellophane price reduction. In this connection it was stated: "It is a continuation of the established policy of the DuPont Cellophane Company to furnish its products to American industry at the lowest possible prices commensurate with manufacturing costs."

The price list announced a complete packaging service including "advice regarding the relative advantages of sheet wrapping." On the first page appeared the word "Cellophane" distinctively displayed, together with the DuPont Cellophane oval with "Reg. U. S. Pat. Off." notice and "Made only by DuPont" arranged so that the oval trade-mark appeared in the center. The price list also carried the notice in bold face type: " 'Cellophane' and/or 'DuPont Cellophane' are the registered trade marks, etc. * * * Cellophane and/or DuPont Cellophane is sold subject to the expressed license restriction to which the purchaser agrees by the acceptance thereof, that no purchaser shall resell it, either in the delivered sizes or cut to small sizes except under the registered trade mark names 'Cellophane' and 'DuPont Cellophane.' "

October 3, 1932, Patent No. 1,929,013 for an adhesive adapted to be used with cellulose materials was granted to the plaintiff.

This patent was incorrectly issued by the Patent Office, the word "cellophane" appearing throughout with small letters, whereas in the original application as filed December 31, 1929, the word "CELLOPHANE" was written in all capitals. On request of plaintiff a certificate of correction was issued by the Patent Office.

Plaintiff continued to write letters drawing attention to the fact that "Cellophane" is its trade-mark, and requesting co-operation in using the word correctly.

Defendant offered the evidence of the man in charge and of the investigators employed by him in an investigation of what the word "Cellophane" means to the public to-day. These investigators testified to their talks with hundreds of people whom they met casually house to house, or on the street, and to the correctness of the answers of such person which the investigators had written to the following questions: (1) What does the word "Cellophane" mean to you? (2) Do you know of any other name than "Cellophane" which you could use if you wanted to buy that kind of material?

To 6 per cent. the word "Cellophane" meant nothing. The remaining 94 per cent., with a few exceptions, who evidently had some knowledge of Cellophane, obviously understood the inquiry as directed to an enumeration of the uses of Cellophane, typical answers being "tough wrapping paper," "transparent material," "cleanliness," "protection for products," "sanitary," "wrapping fruit cake," "keeping vegetables fresh," "nice to wrap things in," "attractive."

Some of the investigators testified that no one whom they met refused to answer the questions. Others said that 3 per cent. to 25 per cent. of the people they talked with refused answers. No record of these refusals was kept. Some said that they explained the questions before they recorded the answers. Others said that 20 per cent. of the people interviewed did not understand what the questions meant.

None of those who are said to have answered the questions were produced for examination or cross-examination, and plaintiff did not know of the existence of the test until it was produced in court.

Plaintiff offered a survey of a different sort. At its request a mail advertising house sent out letters in which, among other things, it said: "I am trying to determine, for one of the leading advertisers of the country, how familiar our most intelligent magazine readers are with trade marked names. Will you help me by putting an 'x' after each name given below which you look upon as a trade mark? You understand, of course, that a trade mark is a name or mark which indicates that the goods bearing this name or mark are manufactured or sponsored by one concern only. * * * Will you put an 'x,' please, after each name below, which you think is a trade mark? Just give your immediate reaction, without investigation or study. Then fill in your name and address, and return it in the addressed envelope attached * * * " "P. S. Just put your 'x' marks below, sign and mail." "Vaseline, Silk, Carbona, Ammonia, Cellophane, Cocomalt, Iodine, Cologne, Postum, Kodak. * * * "

The mail advertising house made arrangements with the publishers of Good Housekeeping, Saturday Evening Post, Ladies Home Journal, and Delineator, for them to mail from their own offices copies of this letter to subscribers to these magazines.

The replies came to the mail advertising house and were tabulated there. Seventeen thousand letters were sent out. Four thousand replies were received.

The following table shows the percentage of the total number of persons who checked the respective names as trade-marks: Silk 6 per cent., Ammonia 10 per cent., Iodine 11 per cent., Cologne 17 per cent., Vaseline 52 per cent., Cellophane 72 per cent., Carbona 78 per cent., Kodak 81 per cent., Cocomalt 94 per cent., Postum 95 per cent.

Vaseline, Carbona, Cocomalt, Postum, and Kodak are trade-marks, and the percentage of replies checking them as trade-marks ran from 52 per cent. to 95 per cent.

Silk, Ammonia, Iodine, and Cologne are not trade-marks, and the percentage of replies checking them as trade-marks ran from 6 per cent. to 17 per cent.

Cellophane was checked as a trade-mark by 72 per cent.

None of the signers of these letters were called and examined or cross-examined. Plaintiff's survey was made in May and June, 1933, and was known and accessible to defendant for four months before the trial.

The testimony of the clerks of Kress stores as to the questions asked and answers received to the questions propounded in defendant's survey does not differ to any great extent from that of the investigators. Users of transparent wrapping were called by both plaintiff and defendant.

Plaintiff called witnesses representing prominent concerns having a nation-wide business, who were familiar with various

trade-marks used by the different manufacturers of transparent wrapping. "Cellophane" meant to them DuPont's transparent wrapping, and "Sylphrap," Sylvania's product.

Defendant's witnesses stated that when they used the word "Cellophane" they did not expect to get any particular manufacturer's product, but all had seen plaintiff's advertising, and some had received price lists from plaintiff on which the trade-mark notices were prominently displayed.

Defendant called paper dealers who were its customers, who testified that they regarded defendant as a distributer, and in specifying orders placed with the defendant, or in inquiries for prices, they did not intend to get the product of any particular concern. When their customers ordered Cellophane, they delivered the material bought from the defendant, without asking whether or not they wanted DuPont's product. These customers usually called for Cellophane or Cellophane paper. The expressions "transparent cellulose wrapping," "transparent wrapping paper," "cellulose," "transparent," and "transparent paper" are well known to the trade in connection with the material. Witness Chatfield testified: "As I said before, it did not make any difference to us as long as it was cellulose." And: "I knew that Cellophane was put out by the DuPont Company, but I would not say that I knew it was a trade mark, because I don't think I ever have seen it marked as a trade mark." "Cellophane is transparent paper." Witness Turkel placed orders with defendant for cellulose, transparent cellulose, and transparent wrapping paper, and obtained the material he wanted. Some of the dealers admitted having seen DuPont's advertising in the Saturday Evening Post and other publications. One dealer, Selfin, testified that he had to substitute "Kodapak" because he was out of stock from defendant.

Breskin, publisher of the magazine Modern Packaging, testified that in 1927 Modern Packaging spelled the word "cellophane" with a small "c"; subsequently his magazine changed from the small "c" to the large "C" at the request of the plaintiff. About 1930 when Breskin began writing advertising for Sylvania and publishing it in Modern Packaging, he discontinued using Cellophane in news items and switched to "transparent cellulose sheetings," or "transparent cellulose wraps." Sylvania instructed Modern Packaging not to use the word "Cellophane" in its advertising, but to qualify "Sylphrap" by the use of the words "transparent cellulose

sheets" or "wraps." About that time two other companies appeared, making four, and the use of the expression "transparent cellulose sheets" as applied to all these products seemed to be a good way for Modern Packaging to avoid showing favoritism by using the trade-marks of any of the four companies that were in the field at that time. The two other companies were the Eastman Company and the Celluloid Corporation. Eastman manufactured Kodapak, and Celluloid manufactured Protectoid, both cellulose acetate sheetings. So far as physical characteristics, general usage, and appearance were concerned, Kodapak and Protectoid were the same as the DuPont and Sylvania products.

Breskin includes Cellophane, Sylphrap, Kodapak, and Protectoid, under the term "transparent cellulose." He differentiates between Glassine and transparent cellulose in connection with a machine that will handle the latter but not the former.

The defendant in its business has supplied, and has been in the habit of supplying, transparent wrapping and sheets not manufactured by plaintiff but manufactured by Sylvania Industrial Corporation, to customers who order "Cellophane" wrapping and sheets, and billing for the same as "cellulose," thereby misrepresenting and acting in such a manner as in all likelihood to mislead the customers into the belief that the sheets and wrapping so supplied were of plaintiff's manufacture.

This case, as is true of trade-mark cases, must be determined on the facts of this particular case, and therefore I have made a complete finding of the facts.

From the facts as found it clearly appears that Cellophane was an invented and fanciful name adopted by the French manufacturer as its trade-mark, under which it manufactured and sold, not a new product, but one which had been known for many years as "cellulose film." This is corroborated by the fact that Brandenberger, in the patents for his machines applied for in 1909, and later issued, describes the product as "cellulose film" and does not mention the word "Cellophane." Further, the registration taken out by the French company in 1912 describes the product as "cellulose sheets," and is based on a registration of the trade-mark in France in 1908.

The claim of the defendant that Cellophane was a new commercial product does not find support in the evidence. The fact that Mr. Yerkes, the president of the plaintiff,

speaking of the French manufacturer, said that "Cellophane was a fanciful name which he gave to a new product he invented," does not change the established fact, as Mr. Yerkes is a business man not a chemist, and I prefer to accept Dr. Little's opinion, as well as that of other chemists, on that subject. But I am convinced that Mr. Yerkes thought they were buying a trade-mark, otherwise the predecessor of the plaintiff would never have made the investment it did with patents covering only the machines, and having but five years to run, as its sole protection. Especially when it is considered that the cellulose film was introduced into this country as a wrapping material, to compete with other then well-known wrapping materials of varying degrees of transparency.

The contention of the defendant that Cellophane never functioned as a trade-mark of the French factory, based as it is almost entirely on the fact that the labels on goods of the French factory, which were shipped to the United States and delivered to customers, with the word "Cellophane" on them, did not contain a notice calling attention to the trade-mark character of the word, nor a chemical synonym such as "cellulose hydrate," is not sustained.

The acquisition of title to a trade-mark does not depend on the use of notices of trade-mark rights, nor is the owner required to give a synonym for his product. Capewell Horse Nail Co. v. Mooney (C. C.) 167 F. 575, affirmed (C. C. A.) 172 F. 826; Armand Company v. Marvin, 349 O. G. 961, 1926 C. D. 73; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 463, 14 S. Ct. 151, 37 L. Ed. 1144; Hanover Star Milling Co. v. Allen & Wheeler Co. (C. C. A.) 208 F. 513, 517, affirmed 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713.

The word "Cellophane" was a distinctive, coined word, and was not descriptive of the goods, nor was it a geographical or personal name, and therefore plaintiff was not required to prove a secondary meaning. Hopkins Definitions (4th Ed.) § 3. See, also, decision of English court, Rowland v. Mitchell, L. R. 1, Ch. D, 71, 74.

The French company first used the word "Cellophane" as a trade-mark in the United States, on the goods it exported to the United States, and sent to Euler as the factory's American distributer, and thereby acquired trade-mark rights in the United States in the name of "Cellophane," which name was not, at that time, used by any one else in the United States. Soc. Enf. Gombault v. Lawrence-Williams Co., 16 Trade Mark Rep. 467,

affirmed (C. C. A.) 22 F.(2d) 512, Cert. denied, 276 U. S. 619, 48 S. Ct. 214, 72 L. Ed. 735; Loonen v. Deitsch (C. C.) 189 F. 487; Deitsch Bros. v. Loonen, 1912 C. D. 531, 180 O. G. 1397, 39 App. D. C. 114; Batcheller v. Thomson, 93 F. 660; Soc. Anon. Du Filtre Chamberland Systeme Pasteur v. Pasteur Chamberland Filter Co., 8 Trade Mark Rep. 298.

The same rule prevails in the English courts. La Soc. Anon. Des Anciens Etablissements Panhard Et Levassor v. Panhard-Levassor Motor Co., 18 R. P. C. 405; Matter of European Blair Company's Trade Mark, 13 R. P. C. 600.

Defendant questions the agency of Euler, but whether the contract between him and the French company be defined as one of general agency or not, the fact remains that under that contract he was an exclusive distributer in this country of the product of the French factory which bore the trade-mark "Cellophane" and acquired a special right and interest in the trade-mark. Upton on Trade Marks, p. 23.

The evidence shows that during the period of the existence of that relationship between Euler and the French factory, and even after the term of the agreement expressed therein had expired, and while the French factory continued to ship goods to Euler, as it had done during the expressed term of the agreement and until 1920, when the relationship between the French factory and Euler ceased, he protected the mark and built up the good will by his advertising, always preserving the identity of the trade-mark and the French factory.

When the relationship between the French factory and Euler ceased, his limited right to the trade-mark came to an end, and the trade-mark reverted to the French concern. Lawrence-Williams Co. v. Soc. Enf. Gombault, supra, and (C. C. A.) 22 F.(2d) 512, 514; Soc. Anon. v. Pasteur Chamberland Co., supra; Hicks v. Anchor Packing Co. (C. C. A.) 16 F.(2d) 723.

The same rule prevails in England. Matter of Trade Mark of Elaine Inescourt, 46 R. P. C. 13.

This doctrine is also applied when a domestic manufacturer grants exclusive selling agency. J. F. Rowley Co. v. Rowley (C. C. A.) 18 F.(2d) 700; Morand Bros. v. Chippewa Springs Corporation (C. C. A.) 2 F. (2d) 237; United States Ozone Co. v. United States Ozone Co. of America (C. C. A.) 62 F.(2d) 881.

The only product ever sold by Euler as

Cellophane was that manufactured by the French factory, and he always maintained the identity of the mark and the manufacturer of the product.

After Euler ceased to be the exclusive distributer of the product, the French concern was entitled to an assignment of the trade-mark registered by Euler.

The DuPont Company became the successor of the French concern, and as such successor was entitled to all the rights of the French concern in the trade-mark registered by Euler. After the assignment by Euler to the DuPont Company, the mark Cellophane was used on the same article, from the same source, on which it had always been used, and on which the public had come to expect it to be used; that is, the product of the French concern, or of DuPont, its successor.

The assignment from Euler, following the assignment from the French concern, vested the DuPont Company with full title to the trade-mark, whatever may have been the rights of Euler.

It is undoubtedly the law that a bare assignment of a trade-mark, unaccompanied by the business and good will which the mark represents, is invalid. The reason for that rule is stated in MacMahan Pharmacal Co. v. Denver Chemical Mfg. Co. (C. C. A.) 113 F. 468, 475, as follows: "The essential value of a trade-mark is that it identifies to the trade the merchandise upon which it appears as of a certain * * * person. * * * Disassociated from merchandise to which it properly appertains, it lacks the essential characteristics which alone give it value, and becomes a false and deceitful designation."

In a case like the present one where the rights of an exclusive distributer are transferred to the manufacturer, which is the successor of the former manufacturer of the product on which the mark has been used, so that after the transfer the mark continues to be used on the identical product with which it has been associated of the same manufacturer, there is no reason for applying the rule.

The public cannot be deceived nor can the essential nature of the mark be affected. What happened by that assignment was that Euler gave up, surrendered, or quitclaimed any rights that he had to the owner of the trade-mark, the successor of the original manufacturer.

This assignment was valid. Witthaus v. Braun, 44 Md. 303, 22 Am. Rep. 44; The Coca-Cola Bottling Co. v. The Coca-Cola Co.

(D. C.) 269 F. 796, 806; Batcheller v. Thomson, supra; Morand Bros. v. Chippewa Springs Corporation, supra.

The fact that Euler after the assignment continued to sell cellulose film still under the trade-mark "Cellophane," is not inconsistent with a valid assignment in good faith of the trade-mark rights by Euler to DuPont, because the film he sold was not manufactured by him, but by DuPont, and he was selling it as a DuPont distributer, and the assignment was valid. American Crayon Co. v. Prang, various decisions reported at (D. C.) 28 F.(2d) 515; Id. (C. C. A.) 38 F.(2d) 448; Id. (C. C. A.) 58 F.(2d) 715.

The case of Eiseman v. Schiffer (C. C.) 157 F. 473, 476, is not in point.

The French concern had exclusive use of the trade-mark "Cellophane" abroad, and had the right to register it here as the owner, and Euler had limited rights to the trade-mark, and was entitled to register it here to protect his rights; but his rights to the mark inured to the owner on the termination of his relations as distributer. Scandinavia Belting Co. v. Asbestos & Rubber Works (C. C. A.) 257 F. 937, 953, 955; Lawrence-Williams Co. v. Soc. Enf. Gombault, supra; LaLanne v. F. R. Arnold & Co. (Cust. & Pat. App.) 39 F.(2d) 269.

The fact that neither knew of the registration by the other is not important, as such registrations were not antagonistic or contradictory one to the other, but were for the protection of the respective rights of each of them.

In any event the defendant cannot justify infringement by questioning the title to the mark, as between the French company, the manufacturer, and Euler, its distributer. Scandinavia Belting Co. v. Asbestos & Rubber Works, supra; United States Ozone Company v. United States Ozone Company of America, supra.

The registration of a trade-mark is prima facie evidence of ownership. Act of February 20, 1905, § 16, 33 Stat. 728. (Title 15, § 96, U. S. Code, 15 USCA § 96); Rossmann v. Garnier (C. C. A.) 211 F. 401, 407.

A similar effect was given to a similar provision of the Trade-Mark Registration Act of 1881 (21 Stat. 502). Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 665, 672, 21 S. Ct. 270, 45 L. Ed. 365.

The registration of a trade-mark creates a presumption of validity. Feil v. American Serum Co. (C. C. A.) 16 F.(2d) 88; Planten v. Gedney (D. C.) 221 F. 281, 283;

Chapin-Sacks Mfg. Co. v. Hendler Creamery Co. (C. C. A.) 254 F. 553, 556.

The French concern first had reason to believe that Euler was making claims beyond those justified by his relations with it in 1920, when he refused to transfer his registration to the French concern.·

The French concern never acceded to these claims, nor did it at any time indicate any intent to abandon its trade-mark rights to Euler, and the dispute was finally ended by Euler's assignment to DuPont after the French concern had assigned to DuPont.

Euler at no time up to the end of December, 1915, when his contract with the French concern, by its terms, was to end, nor up to 1920, during which time the relationship was continued, and the French concern continued to ship goods to him as War conditions permitted, or even after the relationship ended, sold or advertised as Cellophane anything but the product of the French concern.

The trade-mark rights of the manufacturer were not affected by Euler's claim to the trade-mark rights, after the termination of his relations with the French concern. Morand Bros. v. Chippewa Springs Corporation, supra; United States Ozone Co. v. United States Ozone Co. of America, supra.

Having shown that the word "Cellophane" was an invented and fanciful name, adopted as a trade-mark for an old, and not a new, product known as "cellulose film," a genuine trade-mark was acquired, and not a trade-mark by secondary meaning. The distinction between genuine trade-marks and trade-marks by secondary meaning is clearly drawn by the Supreme Court. Delaware & H. Canal Co. v. Clark, 13 Wall. 311, 323, 20 L. Ed. 581; Lawrence v. Tennessee Mfg. Co., 138 U. S. 537, 546, 11 S. Ct. 396, 34 L. Ed. 997.

Trade-mark rights in a nondescriptive mark accrue immediately after the first use. 38 Cyc. 692; Wallace & Co. v. Repetti (C. C. A.) 266 F. 307, 308; Waldes v. International Mfrs. Agency (D. C.) 237 F. 502; Kathreiner's, etc., v. Pastor Kneipp Medicine Co. (C. C. A.) 82 F. 321; Ritz Cycle Car Co. v. Driggs-Seabury Ordnance Corp. (D. C.) 237 F. 125, 128.

The defendant's contention that the plaintiff has not established its right to a trade-mark in the word "Cellophane," by secondary meaning, seems to me to be beside the mark, as I have found that plaintiff has es-tablished a genuine trade-mark, therefore the defendant cannot pass the burden to the plaintiff; but defendant having interposed the defense of abandonment, it must prove it. The law is well settled that a fanciful word which has become a trade-mark cannot pass into the public domain unless it is abandoned by its owner, and abandonment is a question of intent. Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 31, 21 S. Ct. 7, 45 L. Ed. 60; Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 419, 36 S. Ct. 357, 60 L. Ed. 713; Beech-Nut Packing Co. v. P. Lorillard Co. (D. C.) 299 F. 834, 847, affirmed (C. C. A.) 7 F.(2d) 967, affirmed 273 U. S. 629, 47 S. Ct. 481, 71 L. Ed. 810; Mulhens & Kropff v. Ferd Muelhens, Inc. (D. C.) 38 F.(2d) 287, 294, affirmed (C. C. A.) 43 F. (2d) 937; Belden v. Zophar Mills (C. C. A.) 34 F.(2d) 125, 127; Wallace v. Repetti, supra.

The Saxlehner Cases, 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60; 179 U. S. 43, 21 S. Ct. 16, 45 L. Ed. 77, and (C. C. A.) 157 F. 745; Dietz v. Horton Mfg. Co. (C. C. A.) 170 F. 865, 871; and Liebig's Extract of Meat Co. v. Walker (C. C.) 115 F. 822, 825; cited by the defendant, are not in point, as I have found that Cellophane had not become a generic name for the product.

As pleaded by defendant in this case, the defense is abandonment through acquiescence in the use of Cellophane by others. To establish that defense defendant would have to show infringing use by others, of which there is no evidence until after Sylvania came on the scene; but even if acquiescence in trade-mark use by competitors had been shown, it would furnish no ground for denying protection to the trade-mark, unless there were present elements of an equitable estoppel. Menendez v. Holt, 128 U. S. 514, 9 S. Ct. 143, 32 L. Ed. 526.

The facts in this case definitely negative any infringement by others of the trade-mark "Cellophane" or acquiescence by the French concern, plaintiff's predecessor, or plaintiff, in the use of the mark by competitors, or the existence of any elements of an equitable estoppel.

Continuously from 1912 to 1923, except for interruptions during the War period, the French factory shipped goods to the United States marked with its trade-mark. Direct shipments went to Euler until 1920, and between 1920 and 1923 to other exclusive distributers. And likewise the French factory shipped to DuPont from 1923 until its plant was in operation.

882

It is true that others were able to get some shipments from foreign jobbers, but that did not affect the validity of the trade-mark, as all the goods sold by the French factory were marked with its trade-mark "Cellophane," and the trade-mark could not be destroyed because sales were made by others than Euler. Neither did the acts of Birn & Wachenheim, Catty, or Guth, have any legal effect on the rights of the French factory to its trade-mark, because during the whole time it continued to sell its product marked with its trade-mark, and never admitted the right of any other concern to use it.

That Euler and others used other trademarks to sell the factory's product has no legal effect on the trade-mark.

This case, like all others, must be determined on the facts and not on probabilities and impressions, but even if this were not so, the impression would not probably be created that there were plural sources of supply of Cellophane, simply because a number of importers and dealers were competing in the sale of a kind of material they called "Cellophane."

There are no elements of estoppel in this case. There is no evidence of any representation by plaintiff, on which defendant relied, that plaintiff no longer claimed "Cellophane" as its trade-mark; on the contrary, the defendant, by its own admission, never applied the mark to the goods it sold, but in billing its goods used the descriptive term "cellulose."

As I view it, defendant attempted to bring its case under the decision in Bayer Co. v. United Drug Co. (D. C.) 272 F. 505, the effect of which it has misinterpreted, and unless it has succeeded, it can find no support in any other authorities cited.

This case differs vitally from the Bayer Case on the facts.

The Bayer Company manufactured the drug in bulk and sold it under its name to all the leading manufacturing chemists, who compressed the powder into tablets, and put them out for many years in their own packages, with the word "Aspirin," and their own names on the labels, with no reference to Bayer.

It was not of so much importance that Bayer's name did not appear on the labels, but the thing of real importance was that Bayer allowed many other well-known manufacturing concerns to appear as independent manufacturing sources of it.

The public, therefore, became familiar with the name "Aspirin" in association with the names of a variety of dealers, during a period of over ten years, while this practice continued uninterruptedly, and during all of which time no advertising by the Bayer Company reached the consumer.

The course pursued by the Bayer Company resulted in informing the general public that there were many sources of the drug.

In the Bayer Case, it does not seem to me that in so far as the general public was concerned, there was an abandonment of the mark, but rather the use of the mark, with the owner's knowledge and consent, from the time of its first use on labels going to the public, in a way that affirmatively pointed to many manufacturing sources, and not as a trade-mark to the general public.

Under these conditions, the question was whether Bayer could establish a secondary meaning.

The mark was held to be a true trade-mark so far as the trade (as distinguished from the general public) was concerned, but not so far as the public was concerned.

This case is clearly distinguished from the Bayer Case.

Cellophane has never been used in connection with the name of anybody, except the French factory, its exclusive distributers or agents Euler, Catty, and Birn & Wachenheim, and its successor DuPont.

I do not agree with the defendant that in this case the trade-mark "Cellophane" depends upon what is in the customer's mind, nor do I agree with the defendant's contention that the opinion in the Bayer Case is authority for such a holding in this case.

In this case the word "Cellophane" was a true trade-mark from the beginning, while in the Aspirin case, the court held that the word "Aspirin" was not a trade-mark from the beginning, so far as the public was concerned, because its owner by allowing many manufacturers to use it, so as to indicate a product made by them, from the beginning of its use, has introduced it to the public as a generic term.

Under these circumstances the Bayer Company, when attempting in 1915 to reclaim the word "Aspirin" as a trade-mark, was not dealing with a fanciful, coined word, but with an ordinary word of the language.

Therefore, the law as to secondary meaning was properly and adequately stated and applied in the Bayer Case, but has no application in this case.

No authority has been cited or found by me that sustains what I understand to be the defendant's contention that a coined, fanci-

ful word cannot become or have protection as a trade-mark unless secondary meaning be affirmatively proven. Waldes v. International Mfrs. Agency, supra, holds to the contrary.

In this case the packages received by customers from the beginning bore the words "La Cellophane" and "Bezons" or "Thaon." The product was advertised by Euler as a "transparent paper," or "transparent wrapper," sold under the trade-mark "Cellophane," produced by a French concern, of which he was the agent. From 1923 until its plant was completed, DuPont sold as agent of the factory, under the trade-mark name.

During the organizing period, and while its plant was being constructed, DuPont did not advertise to any extent. DuPont commenced to advertise the product to the public in 1926. Practically all of this advertising states that the word "Cellophane" is its trade-mark. Euler protected the name by objecting to its use by other concerns, and they stopped its use. DuPont has been active in seeing that its trade-mark rights were respected.

There is no evidence of any use of the word "Cellophane" in any advertising, or on labels of third persons, which tended to disassociate the word "Cellophane" from the French factory or DuPont. Defendant's assumptions as to the effect of the labels or advertising of Birn & Wachenheim, Bendix, Catty, or Henle, with reference to the trade-mark, are not supported by the evidence, and were inconsequential; but in any event, the burden of proof was on the defendant and not on the plaintiff, and assumptions do not take the place of proof.

█ That Henle, who bought his supply from Euler, advertised "La Cellophane" during a few months in 1914, as well as Euler, did not denote a plural source for the product. A dealer does not destroy the trade-mark by advertising any trade-marked article.

█ The advertising by Birn & Wachenheim, during the short period of their agency in 1922, did not impair the trade-mark; it referred to the French factory, and described themselves as distributers.

After the American corporation was formed by DuPont and the French company, that corporation became the sole source of supply in this country.

█ There is no evidence of the use of the word "Cellophane" by others than DuPont, which was calculated to give the impression that the product came from plural sources.

The great extent of the plaintiff's consumer and trade advertising in newspapers, trade papers, magazines, and direct mail advertising, and its advertising by letters, is clearly shown in the facts as I have found them, and was a sufficient compliance with all legal requirements. So great was the volume of such advertising that space would be needlessly occupied in attempting to analyze it, as it is fully described in the facts as found.

The diligence of the plaintiff in protecting its trade-mark clearly appears in the facts as found.

In the face of all this, there is no basis for the application of the Aspirin case to this case, and this is true as well before as after the formation of the American company.

█ The fact that users of the product advertise it as Cellophane, without reference to the trade-mark, is no evidence of abandonment by plaintiff, as plaintiff could not stop it, although as the facts as found show it has for years been diligent in its efforts to persuade its customers to emphasize the trade-mark character of the word "Cellophane," which it could not enforce by legal proceedings. Prestonnettes, Inc., v. Coty, 264 U. S. 368, 44 S. Ct. 350, 68 L. Ed. 731; Lysol, Inc., v. Montgomery (D. C.) 23 F.(2d) 682; Standard Oil Co. v. California Peach & Fig Growers (D. C.) 28 F.(2d) 283, 285; Columbia Art Works v. Defiance Sales Corp. (C. C. A.) 45 F.(2d) 342.

█ That the small "c" was used at times furnishes no legal ground of complaint. See the way in which trade-mark names are written in the opinion in Lambert Pharmacal Co. v. Listerated Co. (D. C.) 24 F.(2d) 122; Barnes v. Pierce (C. C.) 164 F. 213.

█ Even if it was true that the article sold by plaintiff has obtained such a wide sale that the mark "Cellophane" has also become indicative of quality, that would not destroy the rights of the plaintiff in said trade-mark. Lawrence v. Tennessee Mfg. Co., supra; Burton v. Stratton (C. C.) 12 F. 696; N. K. Fairbank Co. v. Central Lard Co. (C. C.) 64 F. 133; Imperial Cotto Sales Co. v. N. K. Fairbanks Co., 50 App. D. C. 250, 270 F. 686; B. V. D. Co. v. Montgomery Ward & Co., 16 Trade Mark Rep. 423; Ethyl Gasoline Corporation v. Klibanow (D. C.) 1 F. Supp. 584; Ethyl Gasoline Corporation v. Jay-Craver, Inc. (D. C.) 4 F. Supp. 264; Selchow v. Baker, 93 N. Y. 59, 45 Am. Rep. 169; California Cyanide Co. v. American Cyanamid Co. (Cust. & Pat. App.) 40 F.(2d) 1013.

■ The name "Cellophane" characterizes a single thing coming from a single source, and is a valid trade-mark, even if it should be shown that the product is more emphasized than the producer, or that the identity of the producer was unknown. Coca-Cola Co. v. Koke Co. of America, 254 U. S. 143, 146, 41 S. Ct. 113, 65 L. Ed. 189; Coty, Inc., v. Le-Blume Import Co. (D. C.) 292 F. 264, 268, affirmed (C. C. A.) 293 F. 344, 352; Coca-Cola Co. v. Carlisle Bottling Works (C. C. A.) 43 F.(2d) 119, 121; Lambert Pharmacal Co. v. Bolton (D. C.) 219 F. 325; Lambert Pharmacal Co. v. Listerated Co. (D. C.) 24 F.(2d) 122.

■ Defendant offered in evidence the following patents: United States patent No. 991,267, issued to Edwin Brandenberger, for apparatus for the continuous manufacture of cellulose films, granted May 2, 1911, on an application filed July 23, 1909. United States patent No. 1,002,634, issued to Edwin Brandenberger, for manufacture of cellulosic films, granted September 5, 1911, on an application filed July 23, 1909.

In the specification of the last-quoted patent the patentee says: "This invention relates to a machine intended for drying cellulosic films * * * ."

These patents were granted to Brandenberger shortly after or about the time when the name "Cellophane" was coined, and protected certain machinery used by him for the manufacture of a product which he described in these patents as "cellulose films," an old product known under that and other names, and not a new product.

No monopoly in the manufacture of cellulose film was given by these patents, as that was an old and well-known product before they were granted, and long before they expired cellulose film, made under other processes, was sold under the mark "Transparit," in competition with the product made under these patents, and the doctrine of the Singer Case (Singer Mfg. Co. v. June Mfg. Co.) 163 U. S. 169, 16 S. Ct. 1002, 41 L. Ed. 118, does not apply. President Suspender Co. v. MacWilliam (D. C.) 233 F. 433; Id. (C. C. A.) 238 F. 159.

The name "Cellophane" was not the only name to describe the article which the machines were designed to manufacture, as that product was known by a number of names; in fact, the name "Cellophane" does not appear in those patents, but the product to be manufactured is therein described by a name which has survived to this day, "cellulose film," and as there was no patent monopoly, and as the claimed trade-mark "Cellophane" was not the only name to identify the product made by the patented machines, the doctrine in the Singer Case, supra, is inapplicable. Holzapfel's Compositions Co. v. Rahtjen's American Comp. Co., 183 U. S. 1, 22 S. Ct. 6, 46 L. Ed. 49; Shaver v. Heller & Merz Co. (C. C. A.) 108 F. 821, 65 L. R. A. 878.

The case of Singer v. Loog, L. R. 8 App. Cases 15, cited by the defendant, is not in point.

Neither plaintiff nor its predecessor ever had a patent on the product; the only patents were machine patents used in connection with the manufacture of the article, and the doctrine of the Singer Case does not apply. Scandinavia Belting Co. v. Asbestos & Rubber Works, supra; Prest-O-Lite Co. v. Davis (C. C. A.) 215 F. 349, 351; Searchlight Gas Co. v. Prest-O-Lite (C. C. A.) 215 F. 692, 696.

The cases of Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 S. Ct. 1002, 41 L. Ed. 118; Linoleum Co. v. Nairn, L. R. 7 Ch. D. 834; Warren Featherbone Co. v. American Featherbone Co. (C. C. A.) 141 F. 513; Hostetter v. Fries (C. C.) 17 F. 621; Centaur Co. v. Heinsfurter (C. C. A.) 84 F. 955; Merriam Co. v. Saalfield (C. C. A.) 198 F. 369; Walworth Co. v. Moore Drop Forging Co. (C. C. A.) 19 F.(2d) 496; Bayer Co. v. United Drug Co. (D. C.) 272 F. 505, cited by defendant, are not in point.

■ Plaintiff's trade-mark rights in the word "Cellophane" are in no way affected by the use in association with it of the DuPont oval, as two or more trade-marks on the same article may indicate the same origin, whether used separately or together. Loonen v. Deitsch, supra; President Suspender Co. v. MacWilliam, supra, affirmed (C. C. A.) 238 F. 159; Layton Pure Food Co. v. Church & Dwight Co. (C. C. A.) 182 F. 24; Capewell Horse Nail Co. v. Mooney (C. C.) 167 F. 575, affirmed (C. C. A.) 172 F. 826.

Defendant's contention that plaintiff was negligent is in line with its contention that because the public makes widespread general use of the word "Cellophane," notwithstanding the plaintiff's claim to the word as a trade-mark, the word is now public property, and that the word is within the doctrine in the Singer Case, is not sustained, but like both of the latter contentions is clearly disproved by the evidence.

■ Defendant's greatest effort on the trial was to establish its contention that the word "Cellophane" is now public property, and in

making that effort it offered the evidence of what it called a "survey," in which many persons were interviewed by its investigators and by clerks in the Kress stores. This was in no sense a fair test, as it seems to me the answers given were exactly what could be expected to such questions, and I cannot see how plaintiff could even test the facts, as it had no opportunity for cross-examination of those who were supposed to have answered the questions. And if the theory on which I am deciding this case is the proper one, then this evidence is neither competent, material, or relevant; and it might likewise be said of the plaintiff's survey, that it is not competent, material, or relevant; but if any of the evidence of the surveys is admissible, then the plaintiff's survey, which fairly presented the question, shows that an overwhelming number of those who answered knew of "Cellophane" as a trade-mark.

The testimony of purchasers from defendant who dealt in such wrapping paper is that of persons interested, who would be greatly benefited by a victory for defendant. I have not given any consideration whatever to the so-called "surveys" of the defendant or plaintiff, or to the testimony of those participating therein, or the exhibits offered in connection therewith, but have denied the motion of the plaintiff to strike out such testimony and exhibits, and other testimony and exhibits enumerated in said motion, and will allow the record to stand as made.

Plaintiff is not responsible for the opinions or acts of others, but only for its own acts and those of its officers, agents, servants, and employees.

Defendant also produced many little acts of plaintiff, its officers and servants, which it hoped might be construed as not consistent with its trade-mark claims.

The plaintiff is not responsible for, nor could it prevent by legal proceedings, the uses by the public, by advertisers of articles made out of film, and of machines for handling it, where the word is used with a small "c," and the same is true of the uses of the word in the public press, where the general practice is not to capitalize trade-mark names.

Such uses as can be traced to plaintiff either directly or indirectly are too insignificant to furnish ground for depriving it of its trade-mark. Jacobs v. Beecham, 221 U. S. 263, 273, 274, 31 S. Ct. 555, 55 L. Ed. 729; Coca-Cola Co. v. Koke Co., supra.

In any event, the mistakes that individual employees of plaintiff's large organization may have made in using the trade-mark "Cellophane" could not have reached the public at large, and could not have caused any public confusion as to its meaning, nor deceive any one.

The use of the word by plaintiff in connection with such words as "material" or "product," in phrases like "the material called Cellophane," does not support the argument that if there had been any name for it other than Cellophane, it would have been used, because as I have hereinbefore pointed out, there were a number of such names and in the patents and registration names that well described the product, other than Cellophane, were used.

There are many familiar trade-marked articles for which the public seldom uses any name except the trade-mark name itself, and if that fact be sufficient to destroy the trade-mark character of the word, then the purpose of the trade-mark is defeated.

Infringement of a trade-mark has been enjoined where no generic name of the article appeared in the record. Buffalo Specialty Co. v. Van Cleef (C. C. A.) 227 F. 391.

I can find no negligence on the part of the plaintiff, its predecessor, Euler, or the French concern, nor any intent to abandon the trade-mark; on the contrary, there has been diligence displayed in protecting the same.

Defendant admits that on calls for Cellophane it sells the product of Sylvania.

This constitutes infringement of plaintiff's trade-mark. Cutler on Passing Off, p. 1; N. K. Fairbanks Co. v. Dunn (C. C.) 126 F. 227, 228; Barnes v. Pierce, supra; B. V. D. Co. v. Montgomery Ward & Co., supra; B. V. D. Co. v. Kaufmann & Baer Co., 272 Pa. 240, 116 A. 508, and Id., 279 Pa. 152, 123 A. 656; Morgan's Sons Co. v. Wendover (C. C.) 43 F. 420, 10 L. R. A. 283; American Fibre-Chamois Co. v. De Lee (C. C.) 67 F. 329; Winthrop Chemical Co. v. Weinberg (C. C. A.) 60 F.(2d) 461.

Where there has been substitution the law does not require proof that any particular person has actually been misled; it is sufficient that there is likelihood of customers being deceived. Rice & Hutchins v. Vera Shoe Co. (C. C. A.) 290 F. 124, 126; B. V. D. Co. v. Kaufmann & Baer Co., 272 Pa. 240, 116 A. 508; Id., 279 Pa. 152, 123 A. 656; Fuller v. Huff (C. C. A.) 104 F. 141, 145, 51 L. R. A. 332; Rouss, Inc., v. Winchester Co. (C. C. A.) 300 F. 706, 723.

The injunctive relief that may be grant-

ed should be limited as in B. V. D. Co. v. Montgomery Ward & Co., supra; Holeproof Hosiery Co. v. Wallach Bros. (C. C. A.) 172 F. 859; Morgan's Sons Co v. Wendover (C. C.) 43 F. 420, 10 L. R. A. 283.

The defense in the instant case rests wholly on the denial that Cellophane is a trade-mark, and the burden rests upon the defendant to prove either that Cellophane never was a trade-mark, or else that it has been abandoned. Abandonment is not favored and must be strictly proved. 38 Cyc. 881; Recamier Mfg. Co. v. Harriet Hubbard Ayer, Inc. (D. C.) 59 F.(2d) 802; Ansehl v. Williams (C. C. A.) 267 F. 9, 13; Browne on Trade Marks (2d Ed.) 655.

Defendant has failed to bear the burden.

Plaintiff has spent great sums in advertising its trade-mark and product, and defendant is seeking to reap where it has not sown.

Plaintiff's trade-mark Cellophane is valid and infringed.

A decree may be entered in favor of the plaintiff against the defendant, with injunction, accounting, and damages, and of defendant's profits, with costs and the usual order of reference; but the injunction to be issued shall be limited as in B. V. D. Co. v. Montgomery Ward & Co., supra; Holeproof Hosiery Co. v. Wallach Bros., supra; and Morgan's Sons Co. v. Wendover, supra.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by Rule 70½ of the Equity Rules (28 USCA § 723) and Rule 11 of the Equity Rules of this court.